# EXHIBIT 2

```
 1              UNITED STATES DISTRICT COURT
 2           CENTRAL DISTRICT OF CALIFORNIA
 3
 4    GRASSHOPPER HOUSE, LLC, d/b/a    )
      PASSAGES MALIBU, a California    )
 5    limited liability company, d/b/a  )
      Passages Malibu, PASSAGES SILVER  )
 6    STRAND, LLC, a California limited  )
      liability company,           )
 7                             )
                Plaintiffs,      )
 8       vs.                ) Case No.
                           ) CV09-08128RGK
 9    ACCELERATED RECOVERY CENTERS, LLC, ) (PLAx)
      a Georgia Limited Liability      )
10    Company,                  )
                             )
11           Defendant.       )
                             )
12    ACCELERATED RECOVERY CENTERS, LLC, )
      a Georgia Limited Liability      )
13    Company,                  )
                           )DEPOSITION OF:
14         Counterclaimant,   )  CHRIS PRENTISS
                           )TAKEN ON:
15       vs.              )   JULY 20, 2010
                           )REPORTED BY:
16    GRASSHOPPER HOUSE, LLC, d/b/a    )   Candi S. Donnels
      PASSAGES MALIBU, a California    )   CSR No. 10436
17    limited liability company,       )
      PASSAGES SILVER STRAND, LLC, a   )
18    California limited liability      )
      company, CHRIS PRENTISS, and     )
19    PAX PRENTISS, individuals,       )
                           )
20           Counterdefendants. )
      _____.)
21
22
23
24
25
```

1      A    Can we go over them one by one --

2      Q    We will eventually, yes.

3      A    Well, let's do that, then, because I don't

4    want to give a general answer.

5      Q    Give me a list of people that were involved

6    in helping you respond to the document request.

7         MR. HARDER:  Objection.  It calls for a

8    narrative, and it's compound.

9    BY MR. DOROSHOW:

10     Q    Go ahead.

11        THE WITNESS:  Do I answer?

12        MR. HARDER:  If you feel that you can answer the

13   question, then yes.  If you feel you can't answer

14   the question, then let him know that.

15        THE WITNESS:  Francesca Tatman.

16   BY MR. DOROSHOW:

17     Q    Spell the last name, please.

18     A    T-a-t-m-a-n.

19     Q    And what is her relationship to you?

20     A    She works for us as an accountant.

21     Q    Okay.  Is she an in-house --

22     A    Yes.

23     Q    -- employee?

24     A    Uh-huh.

25     Q    Okay.  Who else helped you?

1    A   The attorneys.

2    Q   Okay.  Did your son assist you in any

3   manner?

4    A   No.

5    Q   Okay.  Anyone else other than your

6   attorneys and Ms. Tatman?

7    A   That's all that I remember.  That's all I

8   remember.

9    Q   That's all you can do here.

10    A   Good.

11    Q   Interrogatories, who helped you respond to

12   those?

13    A   Same answer.

14    Q   Okay.  So if I go through each of these

15   individually -- you were saying there's -- it

16   depends on which requests or which interrogatory --

17   there's nobody else that was involved in the

18   preparation of your response?

19    A   Not that I recall.  But when you go through

20   them one by one, I may remember someone.

21    Q   Okay.  Fair enough.

22        Did you have anyone, apart from the people

23   you've just described, look for documents?

24    A   Pardon me.  Could I ask you to close that

25   blind in back of you?

1    question is not what documents exist.

2    **  MR. DOROSHOW:  Would you mark this, please.

3        MR. HARDER:  And it goes beyond the scope of the

4    document request.

5        MR. DOROSHOW:  Very good.

6    Q    Did you in fact withhold producing

7    documents such as confidential settlement agreements

8    from production in this case?

9    A    I don't recall the exact documents or what

10   they were called, but we didn't have --

11   Q    Go ahead.

12   A    -- settlement.

13   Q    And you have written settlement agreements;

14   is that right?

15   A    Yes.

16   Q    Okay.

17       And are you aware whether those documents

18   have been produced or not?

19   A    I'm not.

20   Q    Okay.  I will represent to you they have

21   not.

22   A    Okay.

23   Q    Okay.  Where are those documents today if

24   we want to obtain them?

25   A    The only source that I would know of is the

1    Ganz Law Firm.

2    ** Q    Okay.  Did you communicate with the

3    Ganz Law Firm about any of the documents that were

4    requested --

5        MR. HARDER:  Objection.

6    BY MR. DOROSHOW:

7        Q    -- in this case?

8        MR. HARDER:  Privileged.  I instruct you not to

9    answer.

10   BY MR. DOROSHOW:

11       Q    When you referred earlier to attorneys,

12   which attorneys were you referring to?

13       A    Which question?

14       Q    I asked you who helped you in responding to

15   our discovery, and you said -- you identified your

16   in-house accountant and -- "attorneys" was the word

17   you used.  Who were the attorneys?

18       A    Oh.  Ganz Law.

19       Q    Okay.  So the Ganz Law Firm helped you in

20   responding to the discovery; is that right?

21       A    In questions regarding areas of information

22   that they had, yes.

23       Q    Including documents; is that right?

24       A    Yes.

25       Q    Okay.  Is there any reason why you're aware

PRENTISS, CHRIS  7/20/2010  10:15:00 AM

1    of that you're withholding settlement agreements

2    from us at this point?

3       MR. NITTI:  Objection.

4       THE WITNESS:  Yes.

5    BY MR. DOROSHOW:

6    **  Q    Which is?

7       MR. HARDER:  I'm going to object.  It invades

8    attorney-client privilege.

9       MR. DOROSHOW:  One of the areas of our inquiry

10   today is the reasons why it's been withheld in

11   Item No. 9.  Are you asserting a claim of -- whether

12   or not a claim of privilege is being asserted or any

13   other objections -- nonprivileged -- I'm not asking

14   about his communications.  I'm asking what objection

15   is being made to produce confidential documents.

16      MR. HARDER:  Mr. Prentiss, do you have any

17   knowledge of why documents are or are not being

18   produced in the case other than pursuant to a

19   communication that you've had with counsel?

20      THE WITNESS:  No.

21   BY MR. DOROSHOW:

22   Q    Okay.  Very good.

23         So you stand by your counsel's objections,

24   then --

25   A    Yes.

1    Q    -- as set forth in the discovery response;

2    right?

3    A    Sorry.  Yes.

4    Q    Okay.

5        Now, Mr. Prentiss, have you ever been

6    accused -- charged with any criminal activity?

7    A    No.

8    Q    You have not.  So you have no criminal

9    record at all; is that right?

10    A    That's correct.

11    Q    Okay.  Where were you born, sir?

12    A    New Jersey.

13    Q    What year?

14    A    1936.

15    ** Q    Can I get your Social Security number,

16    please?

17        MR. HARDER:  No.  I'm going to object on grounds

18    of privacy.

19        MR. DOROSHOW:  Really?

20        MR. HARDER:  Yes.

21        MR. DOROSHOW:  Okay.

22    Q    What city in New Jersey were you born in?

23    A    Teaneck.

24    Q    Where?

25    A    Teaneck.

1    independent --

2    Q    How do you internally at your organization

3    calculate the success rate of your organization in

4    treating drug and alcohol?

5    MR. HARDER:  Go ahead.

6    THE WITNESS:  In the first three and a half

7    years, we kept accurate records of our graduated

8    clients by telephone communication primarily.

9    BY MR. DOROSHOW:

10    Q    Okay.  What period of time did that cover?

11    A    From the day we opened for -- until three

12    and a half years.

13    Q    So 2000- --

14    A    -1 --

15    Q    Uh-huh.

16    A    -- for three and a half years.

17    Q    Okay.  Any other means by which you --

18    A    No.

19    Q    -- verified?

20    A    No.

21    Q    Okay.

22    A    It was a self-reporting.

23    MR. HARDER:  Be sure to let him finish --

24    THE WITNESS:  I'm sorry.

25    MR. HARDER:  -- the question and give me a

1    chance to interpose an objection.

2    BY MR. DOROSHOW:

3       Q    When you say "self-reporting," what do you

4    mean by that?

5       A    We would contact them and ask them how they

6    were doing.

7       Q    Okay.  Anything else to verify the accuracy

8    of --

9       A    No.

10      Q    Did everybody respond and tell you how they

11   were doing?

12      A    There were about 12 percent we couldn't

13   communicate with for one reason or another.

14      Q    Okay.  Are there any phone records of these

15   communications?

16      A    I don't think they exist any longer.

17      Q    So you stopped doing this, if I'm correct,

18   in 2004?

19      A    No.  We didn't stop, but there are too many

20   people now to communicate with.

21      Q    So how would you verify, if at all, the

22   success or cure rate after 2004?

23      MR. NITTI:  Objection.  Posits a hypothetical.

24   BY MR. DOROSHOW:

25      Q    Sir?

1    A    In the same method.  We contact them on the

2    phone.

3    Q    So after 2004 were you still continuing to

4    call people by telephone?

5    A    Uh-huh.

6    Q    Is that "yes"?

7    A    That's a "yes."

8    Q    Okay.  And you say there were too many

9    people, though, to contact after 2004?

10    A    Yes.

11    Q    So --

12    A    Too many people to contact all the time.

13    We contacted them in -- for the first three and a

14    half years we kept in contact with them.

15    Q    With everyone?

16    A    Yeah.  Well, except for the 12 percent we

17    couldn't reach.

18    Q    Okay.  And after that period of time --

19    A    We contacted them but sporadically.

20    Q    When you say "sporadically," what does that

21    mean?

22    A    Once a month, twice a month in the

23    beginning and then tapering off into not contacting

24    them at all.

25    Q    Okay.  How long a period of time would

1    elapse before you stopped trying to reach them?

2    A    It varies, you know, person to person.

3    Q    Give me a range, if you could, please.

4    A    One to four months.

5    Q    You would stop contacting them; right?

6    A    Yeah.  Perhaps sometimes we keep in contact

7    with them for a year or two or three.  It depends on

8    the clients.

9    Q    Okay.  Of the people that you would contact

10   after 2004, what percentage of people were you

11   reaching out to?

12   A    What percentage were we reaching out to?

13   As many as we could contact.  I don't know how many

14   that is.

15   Q    Did you keep records?

16   A    No.

17   Q    Okay.  Has this 84 percent cure rate figure

18   ever changed since you began publishing it?

19   A    I suppose it's pretty much the same.  I

20   don't think it's changed.  It may have.

21   Q    Have you ever published any material or

22   document saying that it's changed?

23   A    No.

24   Q    Do you have any records that substantiate

25   that claim?

1    A    No.

2    Q    So this is based purely on your memory?

3    A    Is what based purely on my memory?

4    Q    This claim that you can cure or have cured

5    84 percent of the people who come to you for

6    treatment.

7    A    In the first three and a half years, it was

8    a result of our calling them.

9    Q    Okay.  But you don't have any records.

10    A    No.

11    Q    You don't have any records of who you

12    called; correct?

13    A    We called all of the clients except the

14    12 percent we couldn't reach.

15    Q    Okay.  And is there any records that show

16    who you called --

17    A    No.

18    Q    -- the patient files or otherwise?

19    A    No longer, no.

20    Q    Okay.  Did they ever exist?

21    A    Yes.

22    Q    And when did they exist?

23    A    During the three-and-a-half-year period.

24    Q    In what manner were they recorded?

25    A    I don't know.

| 1 | Q | Who would know? |

| 2 | A | Anna James. |

| 3 | Q | And what was her position then? |

| 4 | A | She was the person who was making the |

5     calls.

| 6 | Q | Okay.  How many people were you treating |

7     back in 2001 to 2004?

| 8 | A | It varied month-to-month.  It was anywhere |

9     from -- in the beginning it was about 3 people or 6

10    people a month, and then it went to 12, and then it

11    went to 18, and then it went to 22, then it went to

12    30.

| 13 | Q | By the -- |

| 14 | A | No.  I don't think it went to 30 in that |

15    early stage.  Maybe 18.  I don't recall the -- when

16    we increased the capacity, but it was along those

17    lines.

| 18 | Q | Okay.  So by 2004, when you stopped calling |

19    everybody, you were reaching out to roughly 18

20    people?

| 21 | A | We never stopped calling everybody. |

| 22 | Q | Okay.  When you -- okay.  During the period |

23    of time from 2001 to 2004 --

| 24 | A | Uh-huh. |

| 25 | Q | -- what you called the early stages -- |

1    A    Uh-huh.

2    Q    -- you were contacting roughly 18 people;

3    is that right?  I'm trying to get an order of

4    magnitude here.

5    A    I don't know what your question is.

6    Q    You just told me there were roughly 18

7    people that were treated at your center in the early

8    days.

9    A    A month.

10    Q    A month.  Okay.

11        So the total --

12    A    Well, it depends on the month.  It depends

13    on the year.  I told you I don't know exactly when

14    the increases occurred, but whatever they were, it

15    was -- we started off with six people; right?

16    And -- or even less when we first started.  And then

17    we increased our capacity.  We went to 12, then we

18    went to 18, and then we went to 22, we went to 30.

19    I don't recall what the dates were, but during those

20    times those were the people that we contacted.  And

21    we weren't always full.

22    Q    Okay.  Of the 84 percent of the people that

23    you claim you cured back in 2001-2004, how many

24    people does that represent in total?

25    A    I don't want to guess.

1    Q    You have no idea?

2    A    I don't want to guess.

3    Q    Okay.  You wrote without reservation a book

4    that you were able to cure 84 percent of people.

5        MR. HARDER:  That's argumentative.  It's not a

6    question.

7        MR. DOROSHOW:  I haven't finished my question

8    yet; so just give me a second.

9    Q    You did some calculation, I presume --

10   right? -- of the number of people that you treated

11   and the number of people who you think you cured.

12   A    I didn't tell you anything about the number

13   of people we treated nor does that book say anything

14   about the number of people we treated.  It says of

15   the people that we treated, we contacted

16   84.4 percent who was clean and sober.

17   Q    Okay.  So that's -- you just made my point.

18   A    Whatever that was.

19   Q    You have to figure out how many total

20   people you treated to figure out what percentage of

21   them were cured, don't you?

22   A    Absolutely.

23   Q    So how many people did you treat?

24   A    I told you I don't know the answer to that.

25   Q    Did you know it at any time?

1      A    Of course.

2      Q    When did you know it?

3      A    At the end of the three-and-a-half-year

4    period.

5      Q    Have you done any calculations past 2004?

6      A    No.

7      Q    You have not?

8      A    No.

9      Q    Okay.  Yet you continue to still make this

10    claim in 2007 when this book was published.

11        MR. HARDER:  I'm going to object.  It's

12    argumentative.

13    BY MR. DOROSHOW:

14      Q    Is that right?

15        MR. HARDER:  It's -- it also lacks foundation.

16        MR. DOROSHOW:  I just established a foundation.

17    **  Q    When this book was published in 2007, you

18    were still making the claim you were curing

19    84 percent of the people you treated; right?

20        MR. NITTI:  Objection.  Argumentative.  And I'll

21    go back to the first amendment privilege.  The

22    client has a first amendment privilege as an author,

23    and on that basis of privilege, I'll instruct him

24    not to answer.  The citation -- it's case number --

25        MR. DOROSHOW:  You don't need to give me the

1     cite.  When we get around to briefing this, you can

2     tell the judge what your theory is.

3         MR. NITTI:  Okay.

4         MR. HARDER:  And I also have an objection.  It's

5     beyond the rule 30(b)(6) deposition notice.

6         MR. DOROSHOW:  I'm trying to figure out what

7     records exist to substantiate this claim.

8         MR. HARDER:  Then ask him what records exist.

9     BY MR. DOROSHOW:

10        Q    Let me try this again, Mr. --

11        MR. HARDER:  You're giving him argumentative

12    statements, Mr. Doroshow.

13            Mr. Doroshow, I'm allowed to say a

14    sentence.  You don't have to leap out of your chair

15    and run to the court reporter's screen and be

16    shaking and standing up every time I say something.

17        MR. DOROSHOW:  I'm reading over her shoulder

18    while you're talking.  Go right ahead.  I'm going to

19    listen.

20        MR. HARDER:  No.  I'm finished.

21        MR. DOROSHOW:  Oh.  You're done?  Okay.

22        MR. HARDER:  It's beyond the Rule 30(b)(6).  If

23    it has to do with documents, ask him.  If it has to

24    do with argumentative statements, then please avoid

25    those.

1       MR. DOROSHOW: I know you don't like listening

2   to this, Mr. Harden, (sic) and I wouldn't want to

3   either, but I would appreciate -- I'm trying to

4   figure out what documents exist for what period of

5   time, and to do that I need to figure out how he was

6   making calculations and whether or not he was

7   recording those calculations.

8       MR. HARDER: I understand that, and I haven't

9   objected to those.

10      MR. DOROSHOW: Okay. Can I continue?

11      MR. HARDER: But you're interspersing those

12  questions with improper questions that are beyond

13  the Rule 30(b)(6) that are argumentative, and so I'm

14  trying to keep you to your own 30(b)(6) notice. You

15  wrote it -- I didn't -- so I expect you to follow

16  it.

17      MR. NITTI: And the last question, in addition,

18  was leading. That's part of the problem.

19      MR. HARDER: Well, he's allowed to ask leading

20  questions.

21      MR. NITTI: Well, not really.

22      MR. DOROSHOW: No. You guys want to discuss

23  this and let me know if I can ask leading questions

24  or not?

25      You're not a very happy young man, are you?

1        MR. NITTI:  I can make the objection for

2    purposes of the deposition.  It's not necessary

3    that you -- not for sure how you're going to bring

4    him on as a hostile witness or not.

5        MR. DOROSHOW:  You're not going to be in this

6    case much longer.  There's a reason he's sitting

7    here.  Is that true, Mr. Harden (sic)?

8        MR. HARDER:  I'm sorry.  What's your question

9    for the witness?

10        MR. DOROSHOW:  Is Mr. Nitti here to make

11    objections as well as you?

12        MR. HARDER:  You know the answer to that

13    question.  The ground rules were discussed before we

14    started.  So let's press on.

15        MR. DOROSHOW:  Okay.  Are you done, Mr. -- are

16    you done, Mr. Harden (sic)?  Can I ask him a couple

17    questions, then?

18        MR. HARDER:  That's why we're here,

19    Mr. Doroshow -- for you to ask questions.

20        MR. DOROSHOW:  You're raising your voice now.

21    Is there something else you want to add before I get

22    going again?

23        MR. HARDER:  No, there's not.  I'm waiting for

24    you to get going again.

25        MR. DOROSHOW:  I'm trying, sir.  Would you

PRENTISS, CHRIS  7/20/2010 10:15:00 AM

1     please allow --

2     THE REPORTER:  Hold on.

3     MR. HARDER:  Go ahead.  Ask.

4     MR. DOROSHOW:  You're now raising your voice,

5     and you're obviously frustrated.

6     MR. HARDER:  I don't think I'm raising my voice.

7     MR. DOROSHOW:  Do you need a few minutes?

8     Because we can stop and take a break.

9     MR. HARDER:  Do you need a few minutes to get

10    some questions together to ask the witness?  Because

11    I'm still waiting.

12    MR. DOROSHOW:  I'm trying, Mr. Harden (sic).

13    And I know this is not something you want to listen

14    to.

15    Q    In 2004 and after 2004, were there any

16    records created or are there any documents that

17    exist today that substantiate the claim that you're

18    able to cure 84 percent of the people you treat in

19    your facility?

20    MR. HARDER:  Asked and answered.

21        Go ahead and answer again if you want to --

22    THE WITNESS:  No.

23    MR. HARDER:  -- or if you have anything new to

24    add.

25    ///

1      BY MR. DOROSHOW:

2      Q    There are no such new documents?

3      A    No.

4      Q    Okay.  What steps, if any, do you take

5      apart from judging whether or not somebody's been

6      cured or not, in your words, to determine a person's

7      condition after they leave your facility?

8      MR. HARDER:  I'm going to object.  It's beyond

9      the scope of the Rule 30(b)(6) notice.

10      MR. DOROSHOW:  Patient records are not -- are

11      not -- within the scope of what we're asking for.

12      MR. HARDER:  Well, he's not going to disclose

13      patient records.  That's privileged.

14      MR. DOROSHOW:  It is?

15      MR. HARDER:  Oh, sure.

16      MR. DOROSHOW:  It's private.  I agree with you

17      there.

18      MR. HARDER:  Yeah, it's private.

19      MR. DOROSHOW:  It's not absolutely privileged,

20      my friend.

21      MR. HARDER:  Oh.  I disagree with you.

22      MR. DOROSHOW:  You do.

23      MR. HARDER:  I think there is a

24      patient-medical --

25      MR. NITTI:  No.

1        MR. HARDER:  -- practitioner privilege.

2        MR. NITTI:  I can state it's absolutely private

3    under federal law -- under Code of Federal

4    Regulations.

5        MR. DOROSHOW:  There's a privacy issue, sir.

6        MR. HARDER:  Okay.

7        MR. DOROSHOW:  If you have a cite for it's

8    absolutely privileged, please share it with me.

9            Do you have anything you want to offer?

10       MR. HARDER:  I didn't come prepared with points

11   and authorities for you, Mr. Doroshow.

12   BY MR. DOROSHOW:

13   **  Q   Sir, would you -- Mr. Prentiss, would you

14   please tell me what records exist to show a

15   patient's condition after they leave your facility,

16   if any.  What type of records are there?

17       MR. HARDER:  I'm going to object.  I'm not going

18   to allow him to answer questions about patient

19   records.

20       MR. DOROSHOW:  Again, I'm not asking what was in

21   the records.  I want to know what type of records

22   exist just so we're clear.

23       MR. HARDER:  I think it's still within the

24   privacy.  Because if he answers, then he's

25   identifying for you what's in a patient's file, and

1   I think that that's private, and I think it's

2   privileged, and I don't think that you're entitled

3   to it, and I think it's beyond the scope of your

4   case.

5       And I know how you love to laugh at

6   everything I say; so laugh away and then ask your

7   question.

8       MR. DOROSHOW: I just feel sorry for you.

9   You're getting yourself in serious trouble here.

10  You're going to tell him he can't answer what type

11  of documents they have to show a person's condition

12  after they leave their facility? Is that what your

13  position is?

14      MR. HARDER: My position is that patient records

15  are private and privileged.

16      MR. DOROSHOW: The type of records that they

17  keep.

18      MR. HARDER: Yes.

19      MR. DOROSHOW: Okay. My best to you, sir.

20  Q   Okay. Here's what we're gonna do,

21  Mr. Prentiss. It is now 11:42. I'm going to stop

22  in about 15 minutes. We're going to take a lunch

23  break. Okay? I'd like to get started again at

24  1:00 o'clock. Okay? Does that work for you?

25  A   That's fine for me.

1      Q    Be a little more specific for me if you

2      would, please.

3      A    Bills payable, accounts receivable.

4      Q    All accounting records?

5      A    Bills payable, accounts receivable.

6      Q    Does anyone else keep custody of or

7      possession of other documents relating to your

8      facility --

9      A    No.

10     Q    -- other than your accountant?

11     A    No.

12     Q    Is that right?

13     A    That's correct.

14     Q    Okay.

15          MR. HARDER:  Well, vague and ambiguous as to the

16     records you're talking about.

17          MR. DOROSHOW:  Well, let's give you some

18     specifics.

19     Q    Patient records?  Who keeps those?

20     A    They're kept in files.

21     Q    By whom?

22     A    I actually don't know who stores the files.

23     Q    Are they located at your facility?

24     A    Some.  Depends on the age.

25     Q    Okay.  How recent?

PRENTISS, CHRIS  7/20/2010  10:15:00 AM

1      A    I don't know.

2      Q    Okay.  Are some in storage?

3      A    Yes.

4   **  Q    And where are they maintained?

5          MR. HARDER:  I'm going to object.  It's

6      irrelevant and -- I don't see the point of --

7          MR. DOROSHOW:  Where his records are maintained?

8          MR. HARDER:  You want the address of the storage

9      facility?  What --

10         MR. DOROSHOW:  Yes.

11         MR. HARDER:  Okay.  Well, I'm instructing him

12     not to answer.

13         MR. DOROSHOW:  On what grounds?

14         MR. HARDER:  On grounds of privacy.

15         MR. DOROSHOW:  Is that right?  The source or

16     location of potentially discoverable material is

17     private?

18         MR. HARDER:  I don't see how it's discoverable.

19     If you can get an order that it's discoverable,

20     then -- but I don't see how you're going to get into

21     patient records in this case.

22             Excuse me?

23     BY MR. DOROSHOW:

24     Q    Where are the records stored, sir?

25         MR. HARDER:  I have to interpose something.

1    this in my years of practice.

2        MR. DOROSHOW:  A-g-h-a-s-t.

3        Q    Mr. Prentiss, where are these records

4    stored offsite?  What location?

5        MR. HARDER:  Objection.  Vague and ambiguous.

6    Are you talking about the patient records that I

7    just objected to or different records?

8    BY MR. DOROSHOW:

9    **  Q    Any records that you maintain for your

10   facility, where are they located?

11       MR. HARDER:  Don't answer.

12       MR. NITTI:  To the extent they're patient

13   records under federal code of -- Code of Federal

14   Regulations, I object.  I don't have the exact

15   number here.

16        I instruct you not to answer as to the

17   location of any patient records as disclosure of

18   patient records is absolutely prohibited and nothing

19   is to be gained by disclosing where the records are.

20   And in fact, there's security to be compromised by

21   indicating that in this deposition.

22   BY MR. DOROSHOW:

23       Q    You want to follow the instruction or you

24   want to answer?

25       A    I'll follow the instruction of my

1    attorneys.

2       Q    Okay.

3            Are there any other records other than

4    patient records that are stored offsite?

5       A    Not to my knowledge.

6       Q    Okay.  Do you have an outside accountant

7    that you use?

8       A    We do.

9       Q    And what is the name of your accountant?

10      A    Jim -- may I ask Pax?

11      Q    By all means, feel free.

12           MR. DOROSHOW:  Do you have his last name?

13           PAX PRENTISS:  Karp.

14           THE WITNESS:  Jim Karp.

15    BY MR. DOROSHOW:

16      Q    Spell it.

17      A    K-a-r-p.

18      Q    And where is that person located?

19      A    I think he's in the Westlake Village area.

20      Q    Okay.  And how long have you used

21    Mr. Karp's services for?

22      A    About a year and a half or two.

23      Q    Is he with a firm?

24      A    Yes.

25      Q    What's the name of the firm?

1    discovery requests, assuming your counsel will let

2    me question you.  I want to go through it

3    individually, and so I'd suggest, if you haven't

4    already done so, that you go ahead and read those

5    over lunch so we're in a position to get through

6    fairly efficiently.

7        THE WITNESS:  Okay.  Thank you very much.

8        MR. DOROSHOW:  Thank you.

9            (Lunch recess 11:54 a.m. to 12:49 p.m.)

10       MR. NITTI:  Let the record show we're back

11   10 minutes to 1:00 approximately.

12       MR. DOROSHOW:  All set?

13       THE REPORTER:  Yes.

14   BY MR. DOROSHOW:

15       Q    Okay, Mr. Prentiss.  Did you ask anyone,

16   other than the people that you identified this

17   morning, to try to look for documents that may be

18   responsive to our discovery?

19       A    Not that I remember.

20       Q    No employees of yours?

21       A    That's correct.

22       Q    Okay.  All right.  Let's go ahead and put

23   in front of you, if we can, please, the responses

24   that your office -- I'm sorry -- your lawyer's

25   office served in response to our discovery.  And

1       MR. HARDER:  What's the question again, please?

2       BY  MR. DOROSHOW:

3          Q     In order to determine whether there's

4       documents that may be responsive or relevant here, I

5       obviously have to know the manner which you -- when

6       you used the marks and how you used them, and then I

7       can ask you about documents.

8          MR. HARDER:  Well, then this is becoming a

9       substantive deposition.  He's not going to come back

10      again.                    .

11         MR. DOROSHOW:  Okay.

12      **      Go ahead and mark this.

13              I'm getting -- you know something?  You're

14      going to have to get sanctioned, and we're going to

15      have to go on with our work here, but you go ahead

16      and make your record.  Go ahead.

17         MR. HARDER:  Well, why don't we just resume with

18      his substantive deposition because that's what it is

19      that you really want.  You want his substantive

20      deposition, and then you want to know what documents

21      exist that pertain to his substantive responses.  So

22      why don't we just resume at another time, and you

23      can ask both.  The witness is not here for a

24      substantive deposition.  I know you want to make him

25      into a substantive witness, but he hasn't been

1    prepared on the substance.  He's been prepared on

2    the 30(b)(6) issues which are stated in the 30(b)(6)

3    notice, which is different from the questions that

4    you're asking.  You're trying to shoehorn in all of

5    the substantive stuff by saying oh, it's all

6    preliminary to the questions about what documents

7    exist.

8        MR. DOROSHOW:  You done?

9        MR. HARDER:  Uh-huh.

10       MR. DOROSHOW:  Is that a "yes"?

11       MR. HARDER:  (No audible response.)

12       MR. DOROSHOW:  He's shaking his head, just for

13   the record, "yes."  He doesn't want to verbalize.

14   **  Q    Okay.  Mr. Prentiss, what manner did you

15   first begin to use these marks?

16       MR. HARDER:  I'm going to object.  It's beyond

17   the scope.

18       MR. DOROSHOW:  You're going to instruct him not

19   to answer?

20       MR. HARDER:  Yes.

21       MR. DOROSHOW:  Okay.

22           Please mark that.

23           Sanctions this time, though, are not

24   only going to be --

25           (Reporter clarification.)

1      MR. DOROSHOW:  Sanctions in this instance, just

2    so you're on notice, are going to be sought not only

3    against your client but also against you in this

4    instance.

5      MR. HARDER:  Should we just resume the

6    deposition --

7      MR. DOROSHOW:  No.  I'm going to keep going.  I

8    want to make a record of this because I want the

9    magistrate to see exactly how you're conducting

10    discovery in this case.

11      MR. HARDER:  I'd love to have a magistrate here.

12      MR. DOROSHOW:  Call him.  Feel free.  I'm going

13    to proceed.  You have anything else you want to

14    speak about?  Go ahead.  Do what you need to do.

15    Q    What documents show the manner in which you

16    have used these marks?

17      MR. HARDER:  Vague and ambiguous.

18    BY MR. DOROSHOW:

19    Q    Go ahead, sir.

20      MR. HARDER:  If you understand the question.  I

21    don't.  But if you understand it, go ahead and

22    answer.

23    BY MR. DOROSHOW:

24    Q    Do you know what the word "show" means?

25      MR. HARDER:  Argumentative.  Argumentative.

1       THE WITNESS:  Just ask the question again.

2       BY MR. DOROSHOW:

3       Q    I'm asking a question.  Do you understand

4    the meaning of the English word "show"?

5       A    Of course.

6       Q    Okay.  So what I'm asking you is what

7    documents, if any, do you have that show the manner

8    in which you have used these marks historically?

9       MR. HARDER:  Vague and ambiguous.

10      THE WITNESS:  Does that mean I shouldn't answer?

11      MR. HARDER:  No.  You can go ahead and answer.

12      THE WITNESS:  Okay.

13      BY MR. DOROSHOW:

14      Q    I apologize for you, sir, but this is --

15      A    Advertising --

16      Q    -- your lawyer.

17      THE REPORTER:  I can't --

18      MR. HARDER:  Are you getting all the banter from

19    Mr. Doroshow every time he --

20        Go ahead, Chris, and just wait for the

21    court reporter to get all of Mr. Doroshow's --

22      BY MR. DOROSHOW:

23      Q    I said I apologize to you for the

24    interruptions, but it's your lawyer, and I can't

25    stop him from doing it.  I'm trying to ask you a

1    very reasonable question.

2       MR. HARDER:  It's an improper statement.  It's

3    argumentative.  Everything you've said today,

4    Mr. Doroshow, is argumentative.

5       MR. DOROSHOW:  Everything I've said today.

6       MR. HARDER:  Yeah.  Just about.  Pretty close.

7    High percentage.

8       MR. DOROSHOW:  Is this an objection, or you're

9    just speaking?  Because I'll wait.  Go ahead.

10      MR. HARDER:  Yeah.  I'm objecting to your

11   conduct.

12      MR. DOROSHOW:  Which is that I'm asking your

13   client a question?

14      MR. HARDER:  No.  That you're being

15   argumentative.  That you're apologizing to my client

16   for the fact that I'm objecting and doing my job.

17   He's asking you for clarification on your question

18   because your question is so broad and ambiguous it

19   doesn't make any sense, and the witness is having

20   trouble with it.

21   BY MR. DOROSHOW:

22      Q    Are you having any problem understanding

23   what I'm asking you, sir?

24      A    Somewhat, yes.  But I -- I believe that

25   what you asked is how we used the mark.

1      Q    Historically whether there are documents

2      that show how you've used the mark historically.

3      A    I don't know if they still exist, but in

4      the beginning we used it in our advertising.  And we

5      used it -- yeah, in our advertising we used it.

6      Q    And dating back to 2001; is that right?

7      A    Yes.

8      Q    So if such documents exist today, we would

9      find them in advertising documents?

10     A    Yes.

11     Q    Did you search for any of those documents

12     in responding to our discovery?

13     A    I did.

14     Q    Did you find anything?

15     A    No, I did not.

16     Q    Okay.  Find any documents that show how

17     you're using the marks today?

18     A    In our advertising.

19     Q    Okay.  Did you search for that current

20     advertising?

21     A    Yes.

22     Q    Did you produce it?

23     A    I don't know that we produced any because

24     we don't keep the ads.

25     Q    Right.

1       A    So we don't keep copies of the advertising,

2    but that's where we use it.

3       Q    Okay.

4       A    And of course it's on our website.

5       Q    Did you produce anything from your website?

6       A    No.

7       Q    Why not?

8       A    Well, I couldn't produce the website, but I

9    didn't produce anything from it either.

10      Q    Okay.  And the reason was?

11      A    I didn't think it was necessary.

12      Q    For any particular reason?

13      A    No.

14      Q    Okay.

15   **  MR. DOROSHOW:  Can you mark that testimony for

16   me, please.

17      Q    Any other manner that the marks have been

18   used other than in advertising?

19      MR. HARDER:  Calls for a narrative.  Vague and

20   ambiguous.

21      THE WITNESS:  Just general advertising.

22   BY MR. DOROSHOW:

23      Q    Okay.  Do you use the marks at your

24   facility in any manner?

25      A    Sure.

1      Q    How do you use them at your facility?

2      A    Well, they're on a -- on the entrance

3      carpets they have the word "Passages."  It's on our

4      stationery.

5      Q    Okay.

6      A    It's on our business cards.  Our address,

7      passagesmalibu.com, is on our business cards and

8      stationery.

9      Q    Uh-huh.

10     A    It's in our website.  And it's in our

11     advertising.

12     Q    Okay.  Did you produce any copies of your

13     stationery or business cards?

14     A    No, I did not.

15     Q    The reason was?

16     A    I didn't think that's what you were looking

17     for.

18     Q    Okay.

19          Okay.  Do you think that the terms

20     "Passages" and "Passages Malibu" have become

21     associated with you and your organization?

22     A    Yes.

23  **  Q    Okay.  In what sense?

24          MR. HARDER:  I'm going to object.  It's beyond

25     the scope of the document -- of the deposition

1    notice.

2       MR. DOROSHOW:  Are you instructing him not to

3    answer again?

4       MR. HARDER:  Yeah.  Uh-huh.

5       MR. DOROSHOW:  Okay.  Okay.

6       Q    Do you have any documents that would

7    support the claim that people associate either of

8    those marks with you?

9       MR. HARDER:  Vague and ambiguous.

10      Go ahead.

11      THE WITNESS:  Well, people call us all the

12   time -- contact us all the time.

13   BY MR. DOROSHOW:

14      Q    In what way?

15      A    Telephone, letters.

16      Q    Uh-huh.

17      A    E-mail.

18      Q    And you think they contact you because of

19   the names that you use?

20      A    Of course.

21      Q    Okay.  What documentation, if any, exist

22   showing that?

23      A    I don't believe we have any.

24      Q    Okay.

25      MR. HARDER:  It's a vague and ambiguous

1    question.

2    BY MR. DOROSHOW:

3        Q    Do you have phone records of people who

4    call you?

5        A    Some.  Not many.

6        Q    Okay.

7             For how long do those documents exist for?

8        A    I don't know.

9        Q    Is there any procedure within either

10   Grasshopper or Passages Silver Strand that your

11   employees are to keep records of phone calls that

12   are made to you?

13       A    No.

14       Q    So there's no protocol that you ask your

15   employees to follow; correct?

16       A    That's correct.

17       Q    Okay.

18            Okay.  I want you to look at page 6 of your

19   responses.  I'm sorry.  Look at page 5.

20       MR. NITTI:  Can you identify the exhibit number,

21   sir.

22       MR. DOROSHOW:  We're still on the same exhibit.

23       MR. HARDER:  3.

24       MR. NITTI:  Thank you.

25       MR. DOROSHOW:  Uh-huh.

1    Q    On page 5 there's a statement beginning at

2    line 22.  If you would follow it with me, please.

3    A    Line 22?

4    Q    Line 22.

5    A    Okay.

6    Q    "There has been substantial media coverage

7    of responding party and it's addition recovery

8    centers."  I assume that's a typo.

9    A    Wait.  I didn't read what -- I think you

10   left some things out.

11   Q    I'm beginning at line 22.  "There's

12   been" --

13   A    Right.

14   Q    -- "substantial media (print, television

15   and internet) coverage of responding" --

16   A    Okay.

17   Q    "Addition," should that be "addiction"?

18   A    Yes.

19   Q    Okay.  "Recovery centers and services sold

20   and offered for sale under the marks Passages and

21   Passages Malibu."

22        What documents, if any, exist that would

23   substantiate that statement?

24   A    I don't know what it means by "sold."  What

25   does that mean?

1      Q    It's your answer.  I can't -- you verified

2    this, sir.

3      A    Oh.  Sorry.

4      Q    These are your words, not mine.  I'm trying

5    to figure them out too.

6      A    "Sold."  Well, I don't think that we sold

7    anything, but we purchased print, television, and

8    Internet advertising.

9      Q    Okay.

10     MR. HARDER:  It's talking about the media

11   coverage of the services that have been sold and

12   offered for sale under your trademarks.  So the

13   recovery services --

14     THE WITNESS:  It says, "There has been

15   substantial media coverage of responding party and

16   addition" --

17     MR. HARDER:  "Addiction."

18     THE WITNESS:  Oh.  It's "services sold."  Sorry.

19   I got it now.  Yes.  We have done that.

20   BY MR. DOROSHOW:

21     Q    Okay.  What documents show the media

22   coverage that has been provided in connection with

23   your services?  Are there any documents within your

24   possession to substantiate that?

25     A    We don't keep them.  We don't keep the

1    copies of the print and -- there's television

2    segments that we send to the television stations,

3    but we don't have them.

4        Q    Okay.  It says "Since 2001" --

5    continuing -- "Responding party has paid for

6    widespread television, print and internet

7    advertising" --

8        A    That's correct.

9        Q    -- "at a cost of millions of dollars."

10           You see that?

11       A    Yes.

12       Q    Are there records to show the amounts of

13   money that have been spent as stated here?

14       A    Yes.

15       Q    Where would I find them?

16       A    Francesca Tatman.

17       Q    Okay.  Did you give those records to us?

18       A    I don't know.

19       Q    You don't know.

20       A    I don't know.

21       Q    Well, I will represent to you we don't have

22   any accounting records from you at this point.

23       A    Okay.  Then we didn't provide them.

24       Q    Did not?

25       A    Did not.  If you say you didn't have them,

1    we didn't provide them.

2        Q    You're here to testify as to what documents

3    have been produced and what documents have been

4    withheld among other subjects.  Do you know --

5        A    Okay.  I apologize for not having more, but

6    that's the best answer I can give you.

7        Q    Let me finish.

8            Do you know whether or not we have been

9    provided with any accounting records?

10       A    I don't know that.

11       Q    Okay.  And do you know whether, if we were

12   provided with any accounting records, they include

13   accounting records for monies that have been spent

14   for advertising either by television, print or

15   Internet?

16       A    I think the reason that I didn't provide

17   that is because it is -- it is privileged

18   information.  It's trade secret information.  We're

19   providing this to a competitor.

20       Q    Okay.  So you have not provided it so --

21       A    We have not.

22       Q    Okay.  And that's the reason why you think

23   it's been withheld?

24       A    That's correct.

25       Q    Okay.  Any other reason?

1      A    No.

2      Q    Okay.  Earlier, going to the next page -- I

3    asked you about other parties who have been the

4    subject of litigation with Grasshopper or

5    Silver Strand.  And in this page 6 there is a list,

6    as you can see, beginning at line 14 of other

7    entities who you apparently contacted through cease

8    and desist letters.

9      A    Well, Ganz probably did that.  I didn't do

10   it.  I did it through my attorney.

11     Q    All righty.

12          Are you aware whether or not those letters

13   still exist today?

14     A    I don't know.  Ganz would have them if they

15   do.

16     Q    Okay.  Did you produce those letters to us?

17     A    I don't have them.

18     Q    Okay.  Do you know whether your counsel

19   produced them in this litigation?

20     A    I don't know.

21     Q    Okay.  I'll represent to you we do not have

22   any such letters.

23     A    Okay.

24     Q    Okay.  Was there a reason that they were

25   withheld?

1      A   I don't have them.  The attorney has them.

2      Q   That's the only reason they weren't given

3   to us?

4      A   Yes.

5   **  Q   Okay.  So because Mr. Ganz has them, you

6   didn't feel that you had an obligation to give them

7   to us; is that right?

8      MR. HARDER:  Well, that's argumentative.

9      MR. DOROSHOW:  No.  It's a question.

10      Q   Go right ahead.

11      MR. HARDER:  I'm also going to instruct you

12   if -- if any information you have comes from

13   counsel, then you can't answer the question.

14      THE WITNESS:  It comes from counsel.

15   BY MR. DOROSHOW:

16   **  Q   So you're telling me that you didn't

17   produce these documents because Mr. Ganz has them

18   and you don't; is that right?

19      MR. HARDER:  That's argumentative, and it's been

20   asked and answered, and the --

21      MR. DOROSHOW:  This is amazing.

22      MR. HARDER:  -- objection is privileged.

23      MR. DOROSHOW:  The objection is privileged?

24      MR. HARDER:  My objection is the information is

25   privileged, and therefore, I instruct him not to

```
 1    answer.

 2        MR. DOROSHOW:  Read the question back, if you

 3    would, please.

 4        (The record was read as follows:

 5        "Q  So you're telling me that you didn't

 6            produce these documents because Mr. Ganz

 7            has them and you don't; is that right?")

 8        MR. DOROSHOW:  And that's privileged?

 9        MR. HARDER:  Same objection.  Same instruction.

10    He's already informed you that the information he

11    has is from counsel.

12        MR. DOROSHOW:  These are documents that are

13    discoverable documents, as you well know, sir -- or

14    at least I think you know.  When documents are in

15    the possession of counsel, they're also in the

16    possession of your client, and they have to be

17    produced, and they're not privileged.  And they're

18    asked for, and they're relevant.  Is there a reason

19    we're not getting those documents or have not

20    received them?

21        MR. HARDER:  That's beyond the scope of your

22    Rule 30(6)(b).

23        MR. DOROSHOW:  Are you serious?

24        MR. HARDER:  Very serious.

25        MR. DOROSHOW:  Did you look at the notice?  What
```

1    documents have been withheld and the reasons they're

2    being withheld.

3       MR. HARDER:  I'm not going to argue with you,

4    Mr. Doroshow.

5       MR. DOROSHOW:  No.  You don't want to answer a

6    straight question but --

7       MR. HARDER:  I'm not the deponent, sir.

8       MR. DOROSHOW:  Oh.  Okay.  You're making an

9    objection.  I'm just asking you if you care to

10   explain --

11      MR. HARDER:  My objection is the question that

12   you answered sought attorney --

13      MR. DOROSHOW:  I didn't answer a question.  I

14   asked one.  But go ahead.

15      MR. HARDER:  Thank you for the clarification.

16         The question that you asked sought

17   attorney-client communications, and I've objected on

18   the grounds of privilege, and I've instructed the

19   witness not to answer any information that comes

20   from counsel.  And that's a perfectly legitimate

21   objection and your laughter and your gestures

22   notwithstanding, Mr. Doroshow.

23      MR. DOROSHOW:  Okay.  Just so we're clear,

24   sanctions are going to be sought against you

25   personally as well as your client for your failure

1   to allow him to answer as well as your failure to

2   produce those documents.

3      MR. HARDER:  And sanctions will be sought

4   against you, sir.

5      MR. DOROSHOW:  For answering -- asking a

6   question?  On what authority?

7      MR. HARDER:  Just ask your question of the

8   witness.

9      MR. DOROSHOW:  You're getting flustered.  You

10   want a minute?

11      MR. HARDER:  I'm not getting flustered at all.

12   I'm waiting for your questions.

13      MR. DOROSHOW:  Okay.

14      MR. HARDER:  You just want to argue with

15   anybody.

16   BY MR. DOROSHOW:

17      Q    As stated in the cease and desist letters

18   that were sent on your behalf --

19      THE REPORTER:  Can you start that question

20   again.

21      MR. DOROSHOW:  Sure.

22   **  Q    As stated in this interrogatory response,

23   were there cease and desist letters sent to one or

24   more of the parties listed at page 6 of your

25   interrogatory responses?

1          MR. HARDER:  And I'm going to instruct the

2     witness that if you've learned information from

3     counsel, you shouldn't answer.

4          THE WITNESS:  The only information I have is

5     from the counsel.

6          MR. HARDER:  If you have information that's

7     beyond your communications with counsel, then you

8     can answer as to that.

9          THE WITNESS:  I have no information that didn't

10    come from the counsel regarding whether or not these

11    letters were sent out.

12    BY MR. DOROSHOW:

13       Q    So we have an interrogatory response that

14    states that there were cease and desist letters sent

15    to each these entities in a document that was served

16    on me, but you won't answer questions relating to

17    whether those letters exist; is that right?

18       A    I will answer any question that my attorney

19    permits me to answer.

20          MR. HARDER:  Well, here's the thing:  He's

21    already said he doesn't have them; so I don't know

22    what you're getting at.  Do they exist?  How is he

23    supposed to know?  They're not in his office.

24          MR. DOROSHOW:  He verified interrogatory

25    responses that said that these letters were sent,

1    and you're telling me he doesn't know that they

2    exist?

3        MR. HARDER:  You're asking for --

4        MR. DOROSHOW:  Hello.

5        MR. HARDER:  You're asking for his personal

6    knowledge.  He can only --

7        MR. DOROSHOW:  He verified these interrogatory

8    responses stating, among other things, that

9    "Numerous third party" --

10       THE REPORTER:  I have to ask you to repeat that

11   slower.

12       MR. DOROSHOW:  Sure.

13          For which responding party by its counsel

14   has sent cease and desist letters, on occasion have

15   filed lawsuits.  This is verified by this

16   individual.

17       MR. HARDER:  I don't know why you're asking the

18   questions about it.

19       MR. DOROSHOW:  Because we're --

20          Mr. Nitti, do you want to help this

21   gentleman?  Maybe --

22       MR. NITTI:  Mr. Doroshow --

23       MR. DOROSHOW:  Please.

24       MR. NITTI:  -- what you're asking -- you're

25   asking whether these letters referenced in answers

1    to the special interrogatories still exist.  I don't

2    think -- no one's denying that the letters were

3    sent.  The answer says that.  Mr. Prentiss is

4    answering that he does not have copies of the

5    letters and he doesn't know if his attorney does

6    without an attorney-client communication.  I don't

7    think there's any inconsistent testimony.

8        MR. DOROSHOW:  So in other words, you don't have

9    to give us the documents because -- if I ask

10   whether --

11       THE REPORTER:  I need you to repeat --

12       MR. DOROSHOW:  In other words, you don't have to

13   give us the documents because, if I ask him whether

14   they still exist today, because he is told by his

15   lawyer that he still has copies of them that's

16   privileged?

17       MR. HARDER:  Is this deposition to replace a

18   meet and confer?  Is that what this is all about?

19       MR. DOROSHOW:  You're getting yourself very deep

20   in trouble.

21       MR. HARDER:  Why don't you just --

22       MR. DOROSHOW:  Can I suggest something to you?

23   Let Mr. Nitti handle this deposition.  You obviously

24   don't know what you're doing here at this point.

25       MR. HARDER:  I don't think you know what you're

1    doing.

2       MR. DOROSHOW:  I don't?  Let's try another

3    question.

4       MR. HARDER:  I think you just want to make

5    everybody upset.

6       MR. DOROSHOW:  No.  I really don't.  I want to

7    get to some information.

8       MR. HARDER:  Come on.

9       MR. DOROSHOW:  How many months has it been since

10   we asked for documents from you?  We're up to what?

11   About 120 days in this case?  Is that about right?

12      MR. HARDER?  So what?  So you have to take a

13   deposition in order to get production of documents?

14      MR. DOROSHOW:  We had to file a motion to compel

15   and for sanctions because you guys couldn't figure

16   out how to fill out --

17      MR. HARDER:  So let the judge rule on it.  Why

18   are you taking the deposition?

19      MR. DOROSHOW:  Mr. Nitti, do you want to help

20   this gentleman because we're really getting very

21   far --

22      MR. NITTI:  I actually don't think he needs any

23   help.  I think he's doing --

24      MR. DOROSHOW:  You like his job -- what he's

25   doing?  Okay.

1      MR. NITTI:  I think he's doing his job.

2      MR. DOROSHOW:  So you join in what he's doing?

3  So when I ask for sanctions --

4      MR. HARDER:  Mr. Nitti is not the deponent.  Why

5  don't you ask questions of the deponent that are

6  proper.

7  BY MR. DOROSHOW:

8      Q    Let's try it again, Mr. Prentiss.  Are you

9  aware whether the cease and desist letters that you

10  verified exist in your interrogatory responses still

11  exist today?

12      MR. HARDER:  Asked and answered.

13      THE WITNESS:  I -- you'd have to ask Mr. Ganz

14  that question.

15  BY MR. DOROSHOW:

16      Q    You don't know?

17      A    Not of my own knowledge, no.

18      Q    Okay.  But you do know that he sent cease

19  and desist letters for you; is that right?

20      A    He said he did.

21      Q    And did he -- do you know that he sent them

22  to each of the companies that -- or entities that

23  are listed at page 6 of your interrogatory response?

24      A    Of my own knowledge I do not know.

25      Q    Okay.

1          Okay.  Tell me how -- when these letters

2      were sent if you know the dates of them.

3          A    I don't know.

4          Q    And do you believe all the letters were

5      sent out of Mr. Ganz's office?

6          A    Whatever letters were sent were sent out of

7      Mr. Ganz's office.

8      ** Q    Okay.  Let me ask you one more time just so

9      we have a clear record.  Do you know why we haven't

10     gotten copies of these cease and desist letters?

11         MR. HARDER:  And my objection is if it calls for

12     communications you've had with counsel, then please

13     do not divulge that information.  If you know of the

14     answer to the question independently of

15     communications with counsel, then go ahead and

16     provide that information.

17         THE WITNESS:  Outside of that, I don't know.

18     BY MR. DOROSHOW:

19         Q    Very good.

20     **       Now at the bottom of page 6 of Exhibit 3

21     you say on information and belief, each of the

22     foregoing entities has stopped its infringing and

23     unauthorized use of your marks.  What do you base

24     that statement on?

25         A    Information given to me by Mr. Ganz.

1    Q    Okay.  What information is that?

2        MR. HARDER:  I'm going to object on privileged

3    grounds.

4        MR. DOROSHOW:  Okay.

5    Q    All right.  Okay.  Interrogatory No. 3 --

6    if you could please turn to it.

7    A    (Witness complies.)

8    Q    Again, this interrogatory asked you to

9    identify documents that show how you've used the

10   marks historically.  Do you see that?

11   A    I do.

12   Q    Okay.  Can you give me any specific

13   documents, apart from what you've already testified

14   to, that show the manner in which the marks have

15   been used?

16       MR. HARDER:  Vague and ambiguous.  Calls for a

17   narrative.

18        But you can answer if you understand.

19       THE WITNESS:  I answered -- I --

20   BY MR. DOROSHOW:

21   Q    You've given everything?

22   A    I understand the question.

23   Q    I'm sorry?

24   A    I understand the question.

25   Q    Okay.  Go ahead and answer it, please.

1      A   Let me just read it to make sure I'm going

2   to answer it correctly.

3      Q   Okay.

4      MR. HARDER:  It's also compound.

5      THE WITNESS:  Okay.  And No. 1 -- answer No. 1

6   down here on page 8, line 17 --

7   BY MR. DOROSHOW:

8      Q   Uh-huh.

9      A   -- it says we operate a leading alcohol and

10   drug addiction treatment facility.

11      Q   I'm asking you what documents show your

12   usage apart from what you've already told me.

13      A   Further on it says that we use them as

14   trademarks and it's our domain name.

15      Q   Uh-huh.

16      A   And we maintain a website at

17   passagesmalibu.com.  And we've been doing business

18   as Passages and Passages Malibu for many years.

19      Q   Okay.

20      A   Well, since 2001.

21      Q   Okay.  Are you aware of any documents that

22   show any confusion between your organization and my

23   client?

24      A   Yes.

25      Q   Which documents are those?

1      A    They advertise with Google by bidding on

2    our name, Passages, and --

3      MR. HARDER:  Let him --

4      THE WITNESS:  -- and they show up on the same

5    page as alternative to Passages, piggybacking on our

6    extended advertising campaign.

7    BY MR. DOROSHOW:

8      Q    Okay.

9      A    And purchase of our own name, Passages

10   Malibu and Passages, with Google.

11     Q    I'm being a little more specific than that,

12   but I appreciate your answer.  The question is has

13   anyone communicated with you that they have been

14   confused as to the source of who they're

15   communicating with?

16     A    They haven't communicated with me.

17     Q    Anybody else that you're aware of?

18     A    They would have communicated with some of

19   our intake staff.

20     Q    Who?

21     A    Probably Michael Shaner.

22     Q    Michael Shaner?

23     A    S-h-a-n-e-r, director of our admissions

24   department --

25     Q    Uh-huh.

1    A    -- or one of his staff.

2    Q    And what do you believe that you have

3    communicated with him about?

4         MR. HARDER:  I'm going to --

5         THE WITNESS:  I can't answer that.

6         MR. HARDER:  I'm going to ask you to answer as

7    to your own personal knowledge but not speculate as

8    to what other people may know or not know.

9         THE WITNESS:  I don't have any -- I didn't

10   listen in on the conversation; so I wouldn't know

11   exactly what they said, but it has been reported to

12   me over the years that there has been considerable

13   confusion with many of the treatment centers listed

14   on the other page -- I think it was page 6 --

15   including Accelerated.

16   BY MR. DOROSHOW:

17   Q    Okay.  Are there any records that show

18   that?

19   A    I personally don't have them, but they may

20   be in Michael Shaner's possession.  But I don't know

21   if he keeps those kinds of records.

22   Q    He's still an employee of yours; right?

23   A    Yes, he is.

24   Q    Okay.  Did you ask him?

25   A    I did.

1     Q     And what did he say?

2     A     I didn't ask him about the records.  I

3     asked him about the communication.

4     Q     And you didn't ask him about the records,

5     though?

6     A     I don't recall if I did or not.  I

7     apologize for that.

8     Q     Well, I'll represent to you again we

9     haven't received any documents that show --

10    A     Okay.

11    Q     -- any such communications.

12          You believe Mr. Shaner may have such

13    records in his possession?

14    A     It's possible.  I have to ask him again.

15    Q     When you say "again," have you ever asked

16    him to look for those type of documents?

17    A     I asked him several questions.  I don't

18    remember exactly what they were, but it could have

19    been if -- I asked him if he had any written records

20    that he kept about the responses from people who

21    called in regarding confusion.  But I don't know

22    that for sure.

23    Q     Okay.

24    A     But I can ask again.

25    Q     All right.  We're getting a little late in

1    Q    What city?

2    A    What city?

3    Q    Are they located.

4    A    I believe that they have an office where

5    they do conduct business from, not treatment. But I

6    believe they have their office in Georgia.

7    Q    Okay.

8    A    But they conduct business out of hotel

9    rooms.

10    Q    Okay. All right.

11        Mr. Prentiss, do you have licenses from the

12    State of California or other governmental agencies?

13    A    We do.

14    Q    What type of licenses do you have?

15    A    Drug and alcohol licenses to operate our

16    facilities.

17    Q    Okay. And how long have you had those for?

18    A    Since 2001 and beyond -- and later than

19    that as we --

20        (Reporter clarification.)

21    THE WITNESS: 2001 and later than that as we

22    acquired new facilities.

23    BY MR. DOROSHOW:

24    Q    All right. List for me all the types of

25    licenses that you have, if you would.

1      A    There's about six licenses.  They're

2    generally under the addresses of the facility --

3      Q    All right.

4      A    -- location.

5      Q    Do you have possession of those licenses?

6      A    Not with me.

7      Q    No.  At your offices or --

8      A    Yes, we do.

9      Q    Did you produce those to us?

10      A    I don't know.  I think we did.  I'm not

11    sure.  I thought -- I thought we did.

12      Q    All right.  You have no reason for

13    withholding them, I'm assuming; right?

14      A    No.

15      MR. HARDER:  You need to let me object.

16      THE WITNESS:  Sorry.

17      MR. HARDER:  If you learned it from counsel, I

18    instruct you not to answer.  If you learned it

19    outside of counsel, you can answer.

20      THE WITNESS:  Okay.

21    BY MR. DOROSHOW:

22      Q    Who are the people that use your services?

23      A    People who are in need of help for drug and

24    alcohol addiction.

25    **  Q    Any particular location in the country?

1    A   -- and alcohol addiction.

2    Q   And you invite those people to contact you

3    if they're in need of your services; right?

4    A   I do.

5    Q   In fact, you give them your number; right?

6    A   I do.

7    Q   Okay.

8        Have you written any other books like "The

9    Alcoholism and Addiction Cure" book on curing

10   alcoholism or drug addiction?

11   A   No, I haven't.

12   Q   This is the only book you've written on

13   that subject?

14   A   That's correct.

15   Q   All right.

16       Any of the other books that you've written

17   deal with that subject in any way?

18   A   No.

19   Q   Okay.  We asked for information about your

20   revenues from your business operations.  Are there

21   documents that show those revenues?

22   A   Those are trade secrets; so I will not

23   produce those.

24   Q   Even under a protective order?

25   A   I can't answer that.  I just will not

1    produce those for the benefit of your client.

2        Q    Okay.  I'll represent to you we've offered

3    and your counsel has at some time or another offered

4    to consider a protective order.  If the document --

5        A    It's not --

6        MR. HARDER:  He's not asking a question; so wait

7    for a question.

8        THE WITNESS:  Sorry.

9    BY MR. DOROSHOW:

10       Q    Again, let me finish.

11   **     If documents were shown to me or lawyers

12   instead of my client, would you be willing to

13   produce those records in this case?

14       MR. HARDER:  Don't answer.  This is a

15   lawyer-to-lawyer issue.

16       MR. DOROSHOW:  It is.  Okay.

17       Q    So your position is --

18       A    I've been instructed not to answer.

19       Q    Okay.  I understand.

20           Your concern is that my client will see the

21   documents; is that right?

22       A    That's correct.

23       Q    Okay.  And because you claim that my client

24   is in competition with you, you think that would be

25   giving them some competitive advantage?

1     A   And you also represent another client who

2     is also in competition with us.

3     Q   Okay.  So that's your concern; is that

4     right?

5     A   Yes, it is.

6     Q   Okay.  Very good.

7         To date, though, you've produced no

8     documents involving your revenues; correct?

9     A   That's correct.

10    Q   All right.

11        How long have you been representing that

12    you can cure alcoholism?

13    A   Since 2001.  It may have been a little

14    later than that.

15    Q   Other than your experience in treating

16    people for drug or alcohol issues, are there any

17    documents that you're aware of that would support

18    your claim that you can cure alcoholism or drug

19    addiction?  Journals?  Articles?  Anything else?

20    A   There have been other books written.  There

21    have been other articles written.  There are many

22    people in the industry -- not in the industry but in

23    the medical profession -- who don't believe that

24    alcoholism and addiction are diseases to begin with.

25    Q   Okay.

1      A    And there are many people who believe that

2      all diseases, if they are such, can be cured.  And

3      they've written and published on those.  There was

4      recently one in Forbes magazine called "The Cure for

5      Nothing."

6      Q    Did you produce any of those articles or

7      books to us?

8      A    No.

9      Q    Okay.  Is there a reason you didn't?

10     A    Is there a reason I didn't write their

11     articles?

12     Q    No.  Is there a reason you didn't produce

13     the articles and books that we requested?

14     A    No.  I don't have a reason for not

15     producing those.

16     Q    Okay.  Fair enough.

17          We asked you in Interrogatory No. 8 to

18     identify the dollar amount that you had spent for

19     each year.

20     A    Pardon me?  What page is that?

21     Q    That's on page 14.

22     MR. HARDER:  Wait for a question.

23     BY MR. DOROSHOW:

24     Q    You ready?

25          We asked you to identify by each category

1    of product or service, by dollar amount, and by year

2    the amount that you have spent on advertising,

3    marketing, or promoting each product or service that

4    you offer for sale or sell.  And your answer is that

5    continuing since at least between the spring and

6    fall of 2001 that you've been paying for advertising

7    on television, print, Internet, and other media

8    using the marks at issue at a cost of millions of

9    dollars.

10    A    That's correct.

11    Q    Are there specific accounting records or

12    other documents that would show the precise amount

13    of money that has been spent on an annual basis?

14    A    Probably.

15    Q    Have those been produced to us?

16    A    Not to my knowledge.  They're trade

17    secrets.

18    Q    In what sense do you consider them trade

19    secrets?

20    A    In the sense that people would know what

21    percentage of our income we spend on advertising.

22    Q    I didn't ask for a percentage of income.  I

23    asked for the dollar amount of spending.

24    A    Same thing.

25    Q    So you pay an outside, third-party vendor

1    to help you with advertising, and you consider that

2    a trade secret?

3      MR. HARDER:  Argumentative.

4      THE WITNESS:  Wait.  Wait.  Wait.

5      MR. NITTI:  It's argumentative.

6      THE WITNESS:  You say pay them to help us with

7    advertising.  No.  We pay for the advertising.

8    BY MR. DOROSHOW:

9      Q    Of course you do.

10         Do you hire a third party to either offer

11   the advertising or to help you develop it?

12     A    Are you talking about CBS?

13     Q    I don't know.

14     A    CNN?  I don't know what you're talking

15   about.

16     Q    You pay for -- as you said earlier, for

17   television; right?

18     A    We do.

19     Q    Okay.

20     A    To who do we pay it to?

21     Q    Yeah.

22     A    Television.  The media.

23     Q    It's a matter of public record.  Or it's a

24   matter of public record with them; correct?

25     MR. HARDER:  Whoa.  Whoa.  Whoa.

1        MR. NITTI:  It's not public record.  I'll object

2    on that ground.

3        MR. DOROSHOW:  You don't think so?

4        MR. NITTI:  Of course not.

5        MR. HARDER:  Hold on.  Hold on.

6        MR. NITTI:  It's proprietary.

7        MR. HARDER:  It's confidential, proprietary

8    information, trade secrets, confidential.  There's

9    no protective order in the case.

10       MR. DOROSHOW:  Guess why.

11          Go ahead.

12       MR. HARDER:  Go ahead?

13       MR. DOROSHOW:  Are you prepared to enter into a

14   protective order now?

15       MR. HARDER:  I'm not the deponent here.

16       MR. DOROSHOW:  I'm asking you a question.  Do

17   you want to answer it or --

18       MR. HARDER:  I want you to finish this witness,

19   and then we can have a meet and confer separate and

20   apart from this deposition.

21       MR. DOROSHOW:  We've tried for months.

22       Q    Okay.  So you have paid third parties

23   either -- including television or the Internet or

24   print to run ads for you; correct?

25       A    That's correct.

1      Q    All right.

2           You consider those to be trade secrets;

3    correct?

4      A    The amounts.

5      Q    The amount you've paid these parties.

6      A    Yes.

7      Q    Okay.  Very good.

8           Who's attempted to register the marks for

9    you -- Passages, Passages Malibu?

10     A    There was an attorney or a trademark --

11   yeah.  I think he was a trademark lawyer -- about

12   three years ago or so -- I don't recall exactly

13   when --

14     Q    Uh-huh.

15     A    -- who started the process for us.  But

16   then I got busy, and we didn't pursue it.  And

17   lately it's been Bradley Ganz.

18     Q    Okay.  Have you licensed these marks to

19   anybody?

20     A    No.

21   **  Q    Has anyone paid you any monetary sum for

22   past usage of the marks?

23        MR. HARDER:  I'm going to object.  It goes

24   beyond the Rule 30(b)(6).

25        MR. DOROSHOW:  You think so?

1        MR. HARDER:  Yeah, I do.

2        MR. DOROSHOW:  We asked for these documents

3    including license agreements, settlement agreements.

4    They were outside the scope of 30(b)(6)?

5        MR. HARDER:  If you're asking about the

6    existence of documents, you're within 30(b)(6).  If

7    you're asking about substantive information, then

8    it's outside.

9        MR. DOROSHOW:  That's your position?

10       MR. HARDER:  Yes.

11   BY MR. DOROSHOW:

12       Q   Are there documents that show monetary

13   compensation that's been paid to you by any third

14   party for past usage of the marks that are at issue

15   in this lawsuit?

16       MR. HARDER:  Vague and ambiguous.

17       THE WITNESS:  We have not sold the marks or

18   licensed them in any way.

19   BY MR. DOROSHOW:

20       Q   I'm not asking that.  I'm asking when you

21   settled with people who have used the marks --

22       A   Oh.

23       Q   -- have people paid you money, and are

24   there documents that show the amount of money that's

25   been paid to you?

1    didn't come from the attorneys, I saw that.

2    Q    You did see?

3    A    I did.

4    Q    Okay.  Where did you get the documents

5    from?

6    A    Depends on the document.

7    Q    From your employees or records?

8    A    Whatever I had that was available.

9    Q    Okay.  Who did you talk to about getting

10   documents responsive to our requests within your

11   organization?

12   A    I don't think I talked to anyone.

13   Q    You did it solely on your own?

14   A    Yes.

15   Q    Okay.  And that includes your accountants

16   that you identified earlier?

17   A    I'm sorry?

18   Q    That would include the accountant you

19   identified earlier?

20   A    Yes.

21   Q    You didn't speak to her either?

22   A    I may have talked to her.  I didn't get

23   anything from her unless it was provided to you.

24   Q    Okay.  Again -- this is getting circular.

25   Did you speak to her about getting any documents to

1    MR. HARDER:  This has been asked and answered.

2    BY MR. DOROSHOW:

3    Q    Go ahead.

4    A    We went through that before.

5    Q    Are there documents that show the amount of

6    money that's been paid to you?

7    A    Bradley Ganz would have that information.

8    Q    Okay.  So you believe there are documents

9    that do exist?

10    A    Bradley Ganz would have that information.

11    Q    I hate to inform you of this in case your

12    counsel hasn't, sir, but the fact that a lawyer who

13    represents you has documents that are responsive to

14    our discovery doesn't mean you don't have to produce

15    them.  You do.

16    A    Oh.  Sorry.

17    MR. HARDER:  Wait.  Wait.  Wait.  That's not a

18    question.  I disagree with the characterization.

19    Just because you ask for something doesn't mean you

20    get it.

21    MR. DOROSHOW:  That's not what I'm saying.  I'm

22    saying if you're in possession, as his lawyer, of

23    documents responsive to our request and they're not

24    privileged, guess what?  You gotta produce them.

25    You disagree with that?

1    MR. HARDER:  I'm saying that I'm not the

2    witness.  It's an argumentative statement.  If you

3    want to have a meet and confer, we can have a meet

4    and confer.  He's here to answer your questions

5    pursuant to the 30(b)(6) notice.

6    MR. DOROSHOW:  You done?  Okay.

7    Q    You think Mr. Ganz has documents that show

8    sums of money that have been paid to you under the

9    terms of the settlement agreements?

10    A    Most likely.

11    Q    Okay.  Have you received any money?

12    MR. HARDER:  I'm going to object.  It -- it --

13    MR. DOROSHOW:  You're digging yourself deep.

14    Keep going.  Keep going.

15    Q    Do you have any records that show --

16    MR. HARDER:  I haven't -- excuse me.

17    MR. DOROSHOW:  Keep coming.  Let's go.

18    MR. HARDER:  Well, it's not about keep coming.

19    It's about stating an objection.  I'm trying to, and

20    you keep interrupting me with all your --

21    MR. DOROSHOW:  Yeah.  I know.

22    MR. HARDER:  -- your outrageous comments.

23    MR. DOROSHOW:  These objections are so

24    frivolous, my friend.  And it's amazing that a

25    lawyer who's been practicing law as long as you

1    tax return component of the question.  I'll instruct

2    the witness not to answer any questions that go to

3    his tax returns.

4       MR. DOROSHOW:  Anything related to his tax

5    returns.

6       MR. NITTI:  Anything as to what's on his tax

7    returns.  It's private.

8    BY MR. DOROSHOW:

9       Q    Have you ever recorded as income any of the

10   settlement amounts that have been paid to you by a

11   third party?  You've told me you don't have any

12   accounting records.

13      A    You're assuming I have received those

14   amounts.

15      Q    So you haven't received them?  Yes or no?

16      A    I don't believe I have.

17      MR. NITTI:  Objection.  It's overbroad as to "so

18   you haven't received them," as to which of the

19   settlements, if any, the question refers to.

20      MR. DOROSHOW:  Okay.

21      Q    You don't think you've received any money

22   from third parties in settlement of claims that have

23   been made or demands that have been made on those

24   parties --

25      A    That's correct.

1    Q   -- in connection with their past usage of

2    the marks that are at issue in this suit; is that

3    right?

4    A   That's correct.

5    Q   So your prior testimony on that is -- we

6    should disregard and accept this --

7    A   What was my prior testimony?

8    Q   Your prior testimony was you believe there

9    were monies that were paid.

10   A   They weren't paid to me.

11   Q   Who were they paid to?

12   A   Ganz Law.

13   Q   And were they then, in turn, paid to you?

14   A   I don't --

15   MR. HARDER:  You just need to slow down a little

16   bit --

17   THE WITNESS:  All right.

18   MR. HARDER:  -- because if I have an objection,

19   I need to get it out.

20        I mean, it's vague and ambiguous and

21   compound -- what we're talking about -- but go

22   ahead.

23   BY MR. DOROSHOW:

24   Q   Go ahead, sir.

25   A   I don't believe that any monies have been

1    tendered to us.

2    Q    Are they being held by Mr. Ganz for you?

3    A    That's a possibility.

4    Q    Well, I'm asking you a specific question,

5    not a possibility.

6    A    I'm telling you that it's a possibility.

7    Q    Do you believe he's holding funds for you?

8    A    Either that or he may have applied them to

9    his legal fees.

10   **   Q    Do you know the amount of money?

11   MR. HARDER:  I'm going to object to that.  It's

12   beyond the Rule 30(b)(6).  I think it's also

13   confidential, privileged, irrelevant.

14   MR. NITTI:  Just for clarification, a tax return

15   is privileged under Revenue and Taxation Code 19542

16   through 19570 as well as various federal cases.  So

17   it's more than privacy.  It is a privilege.

18   MR. DOROSHOW:  So tax returns are always

19   nondiscoverable in any civil litigation matter?  Is

20   that your --

21   MR. NITTI:  No.  There's exceptions like for

22   child support and so on.

23   MR. DOROSHOW:  Not a case like this is what

24   you're saying.

25   MR. NITTI:  But the general rule -- no.  They're

1    there.

2       THE WITNESS:  It's only been through counsel.

3    BY MR. DOROSHOW:

4       Q    Okay.  Do you believe there are any

5    accounting records or other financial records that

6    you have that show any damages that you claim to

7    have sustained in this lawsuit?

8       MR. HARDER:  I'm going to object.  It's vague

9    and ambiguous.  I think it calls for a legal

10   conclusion as to what accounting records are being

11   referred to.

12      MR. DOROSHOW:  This is getting to be comical.  I

13   mean, this is really --

14      Q    Do you have -- do you know what an

15   accounting record is?

16      A    I do.

17      Q    What is an accounting record?

18      A    A record of accounting.

19      Q    Right.

20         You have an accountant -- in-house

21   accountant; right?

22      A    We do.

23      Q    What's her name?

24      A    Francesca Tatman.

25      Q    She's a certified accountant, I assume.

1       A    She's a CPA.

2       Q    All right.  Very good.

3            She creates accounting records for you;

4    right?

5       A    Yes.

6       Q    She maintains those records for you; right?

7       A    Yes.

8       Q    Okay.

9            MR. DOROSHOW:  Mr. Harden (sic), you now

10   understand what we're talking about?

11      Q    Okay.  Here's my question, Mr. Prentiss:

12   Among those accounting records that she's created

13   for you or that anyone else has created for you, are

14   there any documents that you think exist that show

15   any damages that you've suffered in this case?

16      A    Not outside of our legal counsel.

17      Q    Okay.

18           MR. HARDER:  I'm going to object to the

19   question.  It's vague and ambiguous.  Lacks

20   foundation.  Calls for speculation.  Calls for legal

21   conclusion.

22   BY MR. DOROSHOW:

23      Q    Okay.  What documents exist that you think

24   would substantiate your claim that you can cure

25   addiction?

1      MR. HARDER:  Wait.

2      BY MR. DOROSHOW:

3      Q   What documents exist that you think would

4   substantiate your claim to be able to cure

5   addiction?

6      A   That we are able to cure addiction?

7      Q   Correct.

8      A   Testimony of our past clients.

9      Q   Okay.  Is that in written form?

10     A   Some cases, yes.

11     Q   Where would I find it?

12     A   I don't know if you could find it, but we

13   received e-mails and letters and cards.

14     Q   Did you produce any of that to us?

15     A   We didn't keep them.

16     Q   You didn't keep them?

17     A   No.

18     Q   I said what documents exist --

19     A   Oh.  None that I know of.

20     Q   Did you destroy those documents?

21     A   We just don't keep them.

22     Q   Meaning what?  You get a letter from

23   somebody that says --

24     A   We read it and discard it.

25     Q   Okay.  And you keep no record of it?

1      A   No.

2      Q   So today you don't have any documents that

3   would substantiate your claim that you can cure --

4      A   Just the people themselves.

5      Q   I'm asking about documents.

6      A   No documents.  Well -- no.  No documents.

7      Q   Okay.  So when we get to trial, I'm very

8   clear where you're going.  Okay.

9         MR. NITTI:  No documents that are discoverable

10   because the clients' names fall under federal

11   privacy law.

12         MR. DOROSHOW:  That's fine.  You guys gotta live

13   with that when we get to trial; so you take your

14   position, and we'll see what we're gonna do about

15   it.

16      Q   Okay.  Your success rate in curing alcohol

17   or drug addiction -- are there any documents that

18   show your success rate?

19      A   No.

20      Q   Or would substantiate it?

21      A   No.

22      Q   Okay.

23         MR. DOROSHOW:  Okay.  Let's take a break, then.

24   We're going to move on to the document request.

25         THE WITNESS:  How long is the break?

1    MR. DOROSHOW:  Let's see what time we're up to.

2    It's 1:47.  Why don't we come back in about five

3    minutes, seven minutes.  Is that enough for you?

4    THE WITNESS:  Yeah.  I don't need a break.

5    MR. DOROSHOW:  Okay.

6    MR. HARDER:  I could use a break.

7        (Recess taken.)

8    BY MR. DOROSHOW:

9    Q    You ready, Mr. Prentiss?

10    A    Yes, sir.

11    Q    Let's go to it.  Hopefully this will move a

12    little bit quicker if we keep some of the speaking

13    objections down.

14    MR. NITTI:  I think -- I'm sorry, but I think

15    Mr. Prentiss wanted to clarify something.

16    MR. DOROSHOW:  Oh.

17    THE WITNESS:  Right.

18    BY MR. DOROSHOW:

19    Q    Go ahead.

20    A    Yes.  With regard to records that we keep

21    for current status of sobriety for our clients --

22    MR. NITTI:  Your cure rates.

23    THE WITNESS:  Yeah.  Our cure rate.  Thank you.

24    Our cure rate -- we don't keep current records for

25    that.  We had current -- we had records in the past

1    which we kept.

2    BY MR. DOROSHOW:

3        Q    When did you stop keeping those records?

4        A    In 2004.  It was three and a half years

5    after we started to keep them in 2001 that we

6    stopped keeping them.

7        Q    Okay.  Do you have the records back to

8    2001-2004?

9        A    We do not.

10       Q    Okay.  And you don't have any -- you didn't

11   keep records after 2004; so obviously you don't have

12   the records; right?

13       A    That's right.

14       Q    So there's no documentation that would

15   substantiate the claim you've been able to cure --

16       A    That's correct.

17       Q    -- 84 percent of the people that you've

18   treated; correct?

19       A    That's correct.

20       Q    Okay.  Very good.  Thank you for clarifying

21   that.

22            Okay.  Let's look at the document response.

23   And again, I've forgotten which number this is.  I

24   think it's 5, if I'm not mistaken.

25       MR. HARDER:  5.  Responses to request for

1    give to us?

2       A   If you have requested any documents

3    regarding accounting, I may have spoken to her.

4       Q   Did she give you any documents to give to

5    us?

6       A   Not that I know of.

7       Q   Okay.  So we have no accounting records to

8    date; correct?

9       A   I don't know.  Do you?

10      Q   We don't.

11      A   Okay.  No.

12      Q   Okay.  We will soon.  I will guarantee you

13    that.

14         Documents relating to the allegation that

15    you've been using the term Passages for many years.

16      A   Uh-huh.

17      Q   We went through this in answer to the

18    interrogatories.  In this instance, however, you

19    object on the grounds that it's work product and

20    attorney-client privilege.  Are you withholding

21    documents from us?

22      A   What is it that you want to know?

23      Q   I want to know why we're not getting

24    documents that show how you use the term "Passages."

25      A   I think I testified to that -- I gave you

1     the answers to that already.  We do.

2         Q    You do use the term and you have documents

3     that show it including your stationery and other

4     material; correct?

5         A    We do.

6         Q    Why haven't we received that?

7         A    I don't know.  I apologize.  It was an

8     oversight on my part.  But we do have those things.

9         Q    All right.  I hope we will receive them.

10        Same is true of "Passages Malibu" I assume;

11    correct?

12        A    Yes.  Well, you know, "Passages Malibu," I

13    think, only appears on our website.

14        Q    Okay.  So you don't think it's on

15    stationery?

16        A    And print.  And print.  It also appears in

17    print, but we don't keep the print.

18        Q    What other trademarks do you use other than

19    "Passages" and "Passages Malibu."

20        A    Those are the only two.

21        Q    Who selected those names?

22        A    I did.

23        Q    Okay.  Did we receive any documents

24    relating to your efforts to register either one or

25    both of these marks with the California -- in

1      California?

2      A   If you did, they came from the attorneys.

3      Q   Okay.  You don't know whether we have any?

4      A   I don't.

5      Q   Okay.

6          Any documents that show how the word

7      "Passage" -- what it means and how you are using it.

8      A   It's the name of our company.

9      Q   I understand, but is there anything that

10     explains in writing what the use of that name is

11     for?

12     A   Not unless you go to the dictionary.

13     Q   Okay.  Well, apart from the dictionary and

14     the common meaning of the term "passages," is there

15     any documents that you've ever created that explain

16     what it is that you're using that word for?

17     A   I think I referred to it in my book.  I'm

18     not sure, but I think I referred to it -- that

19     "passage" means to go from one condition to another.

20     Q   I think that's right.

21         Okay.  Apart from your book, anything else

22     come to mind?

23     A   I don't think so.

24     Q   Okay.

25         We asked for in Request No. 16 documents

1    showing the relationship between Grasshopper and

2    Silver Strand.  Is there a relationship there other

3    than --

4        A    Not -- none other than the common ownership

5    of my son and myself.

6        Q    Okay.  In your Complaint you say

7    Silver Strand uses the term "Passages" under a

8    license agreement; is that right?

9        A    I believe that's correct.

10       Q    Do we --

11       A    I'm not -- I'm not too clear about the

12   legal aspects of it.

13       Q    Fair enough.

14           Did we get a copy of that license

15   agreement?

16       A    I don't know.

17       Q    No, we didn't.

18       A    All right.

19       Q    Any reason?

20       A    None that I know of.

21       Q    Okay.

22           MR. HARDER:  Lacks foundation.

23           MR. DOROSHOW:  Lacks foundation?  You think you

24   gave it to us?

25           MR. HARDER:  Does the Complaint say "written"?

1        MR. DOROSHOW:  I don't know.

2        MR. HARDER:  I don't know.

3        MR. DOROSHOW:  It says under a license

4    agreement.

5        MR. HARDER:  I don't know if there's a written

6    one.

7        MR. DOROSHOW:  Okay.

8        Q    Is there a written agreement between

9    Passages and Silver Strand?

10        A    I don't remember.  It's quite a ways back

11    now.

12        Q    Okay.  What is the terms of the license

13    agreement between the parties?

14        A    I don't know exactly what the terms are.

15    If there's a written agreement, then it would be

16    contained within it.  But it's probably just the

17    right to use the name.

18        Q    Okay.  Does Silver Strand in fact have the

19    right to use the name?

20        A    Yes.

21        Q    In what context?

22        A    I don't know.  I mean, it may be written,

23    and it may not be.  I don't know.

24        Q    Is there a field of use in which it's

25    allowed to use the name?

1    A    Say that again.

2    Q    Can it use it within any field, or is there

3    a limitation on how it can use it?

4    A    I didn't set any limitations on it.

5    Q    Silver Strand has never applied to register

6    the marks "Passages" or "Passages Malibu"; correct?

7        MR. HARDER:  Object.  Calls for a legal

8    conclusion.  Calls for speculation.

9        MR. DOROSHOW:  Calls for a legal conclusion as

10    to whether or not his organization has ever applied

11    to register the mark "Passages" or

12    "Passages Malibu"?

13    Q    You understand what I'm asking you?

14    A    I'm --

15    Q    The act of registration --

16    A    -- waiting for the -- I'm waiting for an

17    indication whether I can answer it or not.

18        MR. HARDER:  Well, I haven't said you can't,

19    so --

20        THE WITNESS:  Okay.

21        MR. HARDER:  If I don't say instruct not to,

22    then go ahead.

23        THE WITNESS:  Please read me the question again

24    or say what it is.

25    ///

1    MR. DOROSHOW:

2    Q   The question is has Silver Strand, apart

3    from Grasshopper, ever applied to register the mark

4    "Passages" or the mark "Passages Malibu"?

5    MR. HARDER:  Same objections.

6    THE WITNESS:  I don't believe so.

7    BY MR. DOROSHOW:

8    Q   Okay.  Has Silver Strand applied to

9    register any other mark that you're aware of?

10    A   I believe so.  I think Passages -- I think

11    it's -- I think it's applied to register the name

12    Silver Strand.

13    PAX PRENTISS:  Dad, could I use your cell phone

14    for a second?  I'm sorry.  I just got something

15    going on here.  My battery's about to die.

16    BY MR. DOROSHOW:

17    Q   Do you know whether or not Silver Strand

18    has obtained a registration of that mark or any

19    others?

20    A   It's pending.

21    Q   What evidence do you have that Accelerated

22    is continuing to use any of your trademarks?

23    A   None.

24    Q   Do you believe they still are?

25    A   No.

1     Q    What evidence do you have that they ever

2    used any of the marks that are at issue?

3     A    Screen shots.

4     Q    In your Complaint and in Request No. 21,

5    you allege that Accelerated's alleged use of the

6    marks in issue tricks customers, quote, unquote,

7    into thinking defendant's goods and services are

8    associated with plaintiff's.  What documents, if

9    any, would support that conclusion?

10    A    None.

11    Q    How about in terms of potentially confusing

12    consumers?  Do you have any documents to show that?

13    A    Only the website itself.

14    Q    Okay.  Do you have any documents that show

15    that people have been misdirected to Accelerated's

16    website by the use of that mark?

17    A    Only the website.

18    Q    Okay.  You have no documents to show any

19    actual confusion; correct?

20    A    Only the website.

21    Q    Fair enough.

22        Do you believe that any clients or

23    potential clients of yours have been diverted to

24    Accelerated?

25    A    I believe that's the case.

1    Q    And what documentation, if any, do you have

2    to support that?

3    A    None.

4    Q    Why do you believe it?

5    A    Because they continued to purchase

6    advertising for a long time using our name.

7    Q    Okay.  We've been given some of your

8    trademark registration material.  Did you review

9    that before it was produced to us?

10    A    Yes.

11    Q    You did.  Do we have all of your material

12    that's been --

13    A    As far as I know.

14    Q    Let me just finish.

15    A    Sorry.

16    Q    -- that's been submitted to the U.S. Patent

17    and Trademark Office?

18    A    As far as I know.

19    Q    As well as any California state agency?

20    A    As far as I know.

21    Q    Have you given us any documents to show how

22    other people have used the "Passages" marks in the

23    past?

24    A    Not unless it came from our attorneys.

25    Q    Okay.  Do you have any such documents?

1       A    Only in the attorneys' possession.

2       Q    Okay.  What other key words do you use in

3    the Internet advertising?

4       MR. HARDER:  Vague as to time.

5    BY MR. DOROSHOW:

6       Q    Today.

7       MR. NITTI:  I -- I would object on the grounds

8    of trade secret and --

9       MR. DOROSHOW:  What he uses in a public domain

10   is trade secret?

11      MR. NITTI:  No.  Well, what he uses to the

12   extent it's not -- let's meet and confer briefly.

13         To the extent it's not available publicly,

14   I would think that his --

15      MR. DOROSHOW:  Listen to my question, Counsel.

16      Q    The question is what names or marks do

17   you -- key words do you use for Internet

18   advertising?

19      A    "Passages," "Passages Malibu."

20      Q    What other marks or key words have you used

21   in the past?

22      A    We don't have any other marks.

23      Q    Have you used any other key words in the

24   past?

25      A    Hundreds.

PRENTISS, CHRIS   7/20/2010  10:15:00 AM

1    Q   Huh?

2    A   Hundreds.

3    Q   You have.

4        Have you read our counterclaim?

5    A   (No audible response.)

6    Q   Have you read our counterclaim?

7    MR. HARDER:  Which one?

8    THE WITNESS:  Yeah.  Which one?

9    BY MR. DOROSHOW:

10   Q   The most recent counterclaim.

11   A   I'm not sure which one it is.

12   Q   Okay.  Have you used the word "Betty Ford"?

13   A   We did.

14   Q   In what context?

15   A   We had someone who worked for us in

16   Internet optimization, and he was doing that for --

17   Q   Doing what?

18   A   What you just asked me the question

19   about -- using Betty Ford's name.

20       Are you going to pay attention or are you

21   going to work on your phone there?

22   Q   Believe me, I can multitask better than

23   most people; so go right ahead.

24   A   Well, I know, but it disrupts my train of

25   thought that you're watching your phone while I'm

PRENTISS, CHRIS  7/20/2010 10:15:00 AM

1    trying to answer.

2        Q    Go ahead.

3        A    No.  I'll wait until you're finished.

4        Q    How have you used the term "Betty Ford"?

5        A    We had hired an Internet optimizer who for

6    a period of months was buying those names --

7    "Betty Ford" and a few others.  And when I found out

8    what he was doing, I ordered him to stop.

9        Q    How about "John Wayne"?

10       A    "John Wayne"?  I don't know anything about

11   "John Wayne."

12       Q    Okay.  What other names did you instruct

13   him to stop --

14       A    I don't recall what they were.  There was

15   several other treatment center names that he was

16   buying.

17       Q    Was he an employee of yours at the time?

18       A    Pardon me?

19       Q    Was he an employee of yours?

20       A    I believe he was an independent contractor.

21       Q    What was his name?

22       A    Abhilash Patel.

23       Q    Does he continue to be associated with your

24   organization?

25       A    Not for long after that.

1        Q    How long ago did he leave you?

2        A    Years ago.

3        Q    Where is he located today?

4        A    I don't know where he is or what he's

5    doing.

6        Q    All right.  So --

7        A    I heard that he had moved out of state.

8        Q    Okay.  Are you using as key words any other

9    names that -- other than "Passages" or

10    "Passages Malibu" that you feel that you're entitled

11    to use?

12        A    No.  Well, "Silver Strand."

13        Q    Okay.  Did you produce any other

14    documents -- any documents to us showing the use of

15    any key word apart from "Passages,"

16    "Passages Malibu," or "Silver Strand"?

17        A    I don't recall doing that.

18        Q    Okay.  Do you have those documents?

19        A    No.

20        MR. HARDER:  Vague.  What documents?

21        THE WITNESS:  Key word -- documents that relate

22    to what key words we bought?  No.

23    BY MR. DOROSHOW:

24        Q    Yeah.

25        A    We bought them and used them and --

1    Q    That's it?

2    A    -- we don't use them anymore.

3    Q    So you don't have screen shots or anything?

4    A    No.

5    Q    Okay.

6         Are you still using those words today?

7    A    No.

8    Q    Okay.

9    A    Well, we still bid on our own name.

10    Q    I understand.  Apart from your own name.

11    A    I don't think there's any name -- anything

12    that we're bidding on right now except our own name.

13    Q    Okay.  You advertise and offer your

14    services nationally; is that right?

15    A    We do.

16    Q    Is that also internationally?

17    A    Yes.

18    Q    It is.

19         And do you advertise internationally?

20    A    On occasion.  Rare.

21    Q    In what manner do you do so?

22    A    Print.

23    Q    In what form?

24    A    Magazines.

25    Q    Okay.

1       Okay.  We asked you to produce in document

2    request 42 information regarding the fees you charge

3    for your services.  Did you provide us with any such

4    information?

5      A   That's trade secrets.

6    ** Q   Do you have a standard fee for what you

7    charge your client?

8      MR. HARDER:  I'm going to object.

9      THE WITNESS:  Trade secrets.

10    BY MR. DOROSHOW:

11      Q   If I call your agency and ask to be

12    admitted --

13      A   They'll tell you.

14      Q   What the fee would be?

15      A   Sure.

16      Q   Okay.  So even if I don't eventually end up

17    joining you or use -- decide to use your services,

18    if I called your service today and asked -- told

19    them that I had a problem for alcohol or drug and I

20    asked -- or wanted to know what the fee would be for

21    my admission and treatment, they would be willing to

22    share that with me; is that right?

23      A   Yes.

24      Q   Okay.  And you still consider it trade

25    secret?

PRENTISS, CHRIS 7/20/2010 10:15:00 AM

1    A    Sure.

2    Q    Okay.  There's no restrictions on what

3    information they can share regarding the fees?

4    A    None.

5    Q    Okay.

6         We asked you to produce organizational

7    charts.  Do you have such documents?

8    A    No.

9    Q    And you've described earlier what the

10   organization management consists of; correct?

11   A    I did.

12   Q    Okay.  So there have never been any

13   organizational charts or anything?

14   A    No.

15   Q    Do you have a list of employees?

16   A    Yes.

17   Q    Okay.  Did you provide us with a list of

18   your employees?

19   A    No.

20   **  Q    Why not?

21   MR. HARDER:  If it pertains to attorney-client

22   privilege, I instruct you not to answer.

23   Otherwise --

24   THE WITNESS:  Attorney-client privilege.

25   ///

1    BY MR. DOROSHOW:

2        Q    Okay.  So your list of employees you

3    consider to be privileged?

4        MR. HARDER:  That's not what my objection was.

5        MR. DOROSHOW:  Okay.

6        MR. HARDER:  Your question was why did he not

7    produce.

8        MR. DOROSHOW:  I'm asking a different question

9    now if you stay with me.

10       MR. HARDER:  Okay.  It sounded like a follow-up.

11       MR. DOROSHOW:  It is.  It's a different

12   question.

13       THE WITNESS:  What is it?

14   BY MR. DOROSHOW:

15       Q    Do you have a list of current employees?

16       A    Yes.

17       MR. HARDER:  That's been asked and answered.

18   BY MR. DOROSHOW:

19       Q    Do you have a list of former employees?

20       A    I don't know the answer to that.

21       Q    Okay.  Does the list that you have of

22   current employees describe -- just merely list the

23   name of the person?

24       A    Probably.

25       Q    Does it also list what position they have?

1      A    I don't know.

2      Q    Does it include any other descriptive

3    information about them?

4      A    Probably what they earn.

5      Q    What they earn?

6      A    (No audible response.)

7      Q    In your book there are a number of

8    statements made by some of your therapists --

9      A    That's true.

10      Q    -- right? -- giving testimonials and other

11    statements about what they do.

12      MR. HARDER:  Wait for him to ask you a question.

13    BY MR. DOROSHOW:

14      Q    Are you familiar with that?

15      A    Yes.

16    **  Q    Okay.  Why is that information in your

17    book?

18      MR. HARDER:  I'm going to object.  I don't see

19    how that's relevant to the 30(b)(6) issues.

20      MR. NITTI:  And I'll object on the grounds it's

21    first amendment privilege and instruct the witness

22    not to answer.

23      MR. DOROSHOW:  First amendment protects

24    everything; right?  Including false advertising.

25      MR. HARDER:  You've been instructed.

1        MR. HARDER:  -- an improper question.  It's also

2    beyond the 30(b)(6), so --

3        MR. DOROSHOW:  You're going to either instruct

4    him not to answer --

5        MR. HARDER:  I'll instruct him on the 30(b)(6).

6    It's beyond the scope of the deposition --

7        MR. DOROSHOW:  So you're not going to allow him

8    to answer; right?

9        MR. HARDER:  Well --

10        MR. NITTI:  I'll further object that it lacks

11    foundation.

12        MR. HARDER:  -- if you wanted to have a

13    deposition notice for all purposes, then we wouldn't

14    have restrictions.

15    BY MR. DOROSHOW:

16        Q    I've asked the question.  Are you going to

17    answer it, sir?

18        A    I've been instructed not to.

19        Q    Okay.  Fair enough.  Okay.

20            In Request No. 59 we asked you for records

21    showing the number of customers or clients that

22    you've treated on a monthly, quarterly, and annual

23    basis.  Have you produced those to us?

24        A    I don't believe so.

25        Q    Okay.  We've also asked for information

1    about the profitability of your center.  You have

2    not produced that either, I assume; right?

3        A    No, I haven't.

4        Q    And your position is you will not produce

5    it; right?

6        A    That's correct.

7        Q    Okay.  Same with refunds?

8        MR. HARDER:  Wait.  What's --

9        THE WITNESS:  No financial information.

10    BY MR. DOROSHOW:

11        Q    You're not going to give us any financial

12    information?

13        A    That's right.

14        Q    Without a court order; is that right?

15        A    That's correct.

16        Q    Are you aware that there's been any

17    third-party criticism of you or your organization?

18        A    Yes.

19        Q    Including for its claim of being able to

20    cure alcoholism?

21        A    Sure.  Yes.

22        Q    Do you have a medical director on your

23    staff?

24        A    No.

25        Q    Did you formerly have a medical director on

1    STATE OF _____ )

                    )    ss.

2    COUNTY OF_____)

3

4

5

6

7         I, the undersigned, say that I have read

8    the foregoing deposition, and I declare, under

9    penalty of perjury, that the foregoing is a true and

10   correct transcript of my testimony contained

11   therein.

12        EXECUTED this _____ day of _____

13   2010, at _____, _____.

14         (city)          (state)

15

16

17

18

19

20

21        _____

22             CHRIS PRENTISS

23

24

25

PRENTISS, CHRIS 7/20/2010 10:15:00 AM

1    STATE OF CALIFORNIA  )

           ) ss.

2    COUNTY OF LOS ANGELES )

3

4      I, Candi Donnels, CSR NO. 10436, certify:

5      That the foregoing deposition of

6    CHRIS PRENTISS was taken before me at the time and

7    place therein set forth, at which time the witness

8    was placed under oath by me;

9      That the testimony of the witness and all

10   objections made at the time of the examination were

11   recorded stenographically by me and thereafter

12   transcribed;

13     That the foregoing deposition is a true

14   record as reported by me of the testimony and of all

15   objections made at the time of the examination;

16     That the dismantling of the original

17   transcript will void the reporter's certificate.

18     I further certify that I am neither counsel

19   for nor related to any party to said action nor in

20   anywise interested in the outcome thereof.

21     IN WITNESS WHEREOF, I have subscribed my

22   name this _____ day of _____, 2010.

23

24   _____

25        CANDI DONNELS, CSR 10436