# EXHIBIT 3

```
                    IN THE UNITED STATES DISTRICT COURT

                         FOR THE DISTRICT OF OREGON

GRASSHOPPER HOUSE LLC, a          )
California limited liability      )
company doing business as         )
Passages Malibu, Passages         )
Silver Strand LLC, a              )
California limited liability      )
company,                          )
                                  )
          Plaintiffs,             )   No. CV-09-778-HA
                                  )
     vs.                          )
                                  )
RENAISSANCE MALIBU FOUNDATION,)       July 15, 2010
a California non-profit           )
corporation,                      )
                                  )
          Defendant.              )   Portland, Oregon
_____)
```

**Show Cause Hearing**

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE ANCER L. HAGGERTY

UNITED STATES DISTRICT COURT SENIOR JUDGE

Prentiss - D                                                    96

1   for many of the people with whom he was in treatment.  And
2   he almost lost his life three times, and after ten years of
3   a fruitless struggle, I one day told him unless we were able
4   to create a program, that he would die.  And so we created
5   Passages.
6   Q.   And you were involved with creating this program back
7   in 2001?
8   A.   Yes.  It's a program that I created, yes.
9   Q.   And have you done business under the name Passages and
10  Passages Malibu since 2001?
11  A.   Yes.
12  Q.   And does Passages have any trademarks?
13  A.   Yes.  Passages and Passages Malibu.
14  Q.   And have you done any advertising for Passages?
15  A.   Yes.
16  Q.   Can you tell the judge about the advertising.
17  A.   We have spent about $10 million over the period of time
18  from 2001 to present, advertising in many forms:  magazines,
19  newspapers, Internet and television, and some little radio.
20  Q.   $10 million?
21  A.   Yes.
22  Q.   Have you done any advertising in Oregon?
23  A.   Yes.
24  Q.   Would you tell the judge about that.
25  A.   On any given week in Oregon, I can be seen on

1  television somewhere between 3 and 400 times.
2  Q.   What do you mean by that?
3  A.   We advertise on national television stations -- CNN,
4  NBC, CBS and MSNBC, Discovery Channel, Tennis Channel,
5  History Channel, Jeopardy -- just many -- you know, dozens
6  of television stations carry us, and many times, hundreds of
7  times, actually, between 3 and 400 times a week.
8  Q.   Do you advertise in any national print media?
9  A.   Yes.  We advertise in Forbes magazine, Star magazine,
10 U.S. magazine, People magazine, Los Angeles Times, L.A.
11 Times -- New York Times.
12 Q.   And have you written any publications for the recovery
13 industry?
14 A.   Yes, I have.
15 Q.   Can you tell the judge about that.
16 A.   Yes.  I wrote a book called *The Alcoholism and
17 Addiction Cure*, and it's in print now.
18 Q.   The book I'm holding up, Exhibit 22?
19 A.   That's correct.
20 Q.   How has this book been received?
21 A.   It's the standard of the industry today.  It's sold
22 about 200,000 copies, and the average book on recovery sells
23 between 6 and 7,000 copies, and it's in 15 different
24 countries.
25 Q.   In 15 different countries?

1  A.  Yes.

2  Q.  Do you have -- does Passages have clientele from
3  Oregon?

4  A.  Yes.

5  Q.  Tell the judge about that.

6  A.  We have a significant -- most of the clients that we
7  have come from outside of California. Only about 25 percent
8  of our clients come from within California, 75 percent from
9  outside of California. A good share of that comes from the
10 Pacific Northwest, primarily from Oregon. I would suggest
11 that Oregon is representative of about 10 percent of our
12 market. And that varies month to month. Sometimes it could
13 be seven, sometimes it could be 15.

14 Q.  And how does Oregon, the Pacific Northwest, how does
15 that compare as a market to the rest of your markets
16 nationally and internationally?

17 A.  I don't understand the question.

18 Q.  Okay. Are there any specific addictions that you've
19 seen in the Northwest that you have treated?

20 A.  Yes. Not that there are specific to the Northwest that
21 are not specific to Idaho. The street drugs are all over.
22 Methamphetamine is predominant, cocaine, marijuana. A lot
23 of the prescription medications are now prevalent, and a lot
24 of our clients come in who are addicted to prescription
25 medications. And Oregon has its fair share of that, with a

Prentiss - D                                                    99

1  leaning toward meth -- not methadone, methamphetamine. And
2  there was also an epidemic of OxyContin for a while, which
3  is still very prevalent in the state.
4  Q.   Are you familiar with Renaissance Malibu and
5  Renaissance Recovery Services?
6  A.   Yes.
7  Q.   How does their facility or how does their business
8  compare with your business?
9  A.   It's a lookalike.
10 Q.   Why do you say that?
11 A.   Well, we share the same clients. They are competing
12 with us for the same section of the population, which is
13 addicted, which needs help, and that can afford a high-end
14 treatment center, although our Ventura system is a low-end
15 treatment center. It's for people who can't afford that
16 expensive treatment.
17 Q.   Are you familiar with the marketing and advertising
18 operations of Passages Malibu?
19 A.   Yes.
20 Q.   What's your familiarity with that?
21 A.   I'm in charge of it. I determine what the budget is
22 and determine where the money is to be placed.
23 Q.   Okay.
24 A.   I don't do the actual placement. We have people who
25 work for us who do that, but we conduct it.

1  generalized testimony that he believes in his heart -- with
2  no evidentiary basis -- that he's been harmed and that in
3  general an infringer of his trademarks would be diverting
4  traffic on the Internet, something that isn't particularized
5  to any of the issues that we're here to consider today with
6  respect to my client and anything that they are alleged to
7  have done.
8         THE COURT:  All right.  I'll sustain that
9  objection.  I would probably agree with that.  Okay.
10 BY MS. BLOCK: (continuing)
11 Q.   Mr. Prentiss, does Malibu advertise on Internet search
12 engines?
13 A.   Yes.
14 Q.   And can you tell describe for the judge how pay per
15 click advertising works?
16 A.   Yes.  Pay per click advertising relates to keyword
17 advertising, where we select a keyword, such as "drug rehab"
18 or "alcohol rehab," which are the two main key phrases in
19 the industry, and then we submit a bid to one of the search
20 engines.  And if we're the high bidder, then we appear in
21 the sponsored link above the organic listing.
22 Q.   So say you're bidding on your trademark, Passages
23 Malibu --
24 A.   Or whatever the link is, yeah.  We can bid on anything.
25 And if we bid on, for instance, on the word "drug rehab" and

1  someone types in "drug rehab" into their search bar, then
2  all the organic listings will come up, and above it will be
3  the three sponsored links, which is purely a result of
4  bidding, and whoever is the high bidder is in the first
5  position and subsequently the lower positions, lower
6  bidders.
7  Q.   Is this type of advertising, this pay per click
8  advertising, effective for your business?
9  A.   It's essential.
10 Q.   Why do you say that?
11 A.   Well, without that we wouldn't be in business.  It's
12 what put us in business, because when you first start off in
13 business, no one knows you're there and the only way you can
14 have a presence in the world is to find out what people are
15 looking for and then buy sponsored links on that area.  So
16 if someone is looking for help with addiction or alcoholism,
17 and they type in a key phrase, searching for that help, that
18 you will appear in that space above what they're looking
19 for, and hopefully they'll click on your name.
20 Q.   And so have you been in a position where you're bidding
21 against an unknown party for your own trademark for Passages
22 or Passages Malibu?
23 A.   Yes.
24 Q.   And do you sometimes get knocked out of the first
25 position in the sponsored link?

1  A.  Yes.
2  Q.  Does it affect the amount you pay?
3  A.  Of course. It's like an auction. If someone is
4  overbidding us and we want to achieve the top spot, we have
5  to increase our bid.
6  Q.  What kind of advertising -- how much are you spending
7  on these keywords?
8  A.  $10,000 a day.
9  Q.  That's just average?
10 A.  That's the budget. Now, that's not the budget today,
11 because we have switched a portion of that to our television
12 advertising, but during the time, the period that you're
13 talking about, it was $10,000 a day.
14 Q.  And is this an effective -- are you actually getting
15 clients if you're spending that kind of money? Are you
16 actually getting business from it?
17 A.  Of course. That's -- well, now we get a lot of
18 referrals, but primarily that's where the new clients come
19 from.
20 Q.  Can you estimate how many patients your business
21 attracts from Internet advertisements?
22 A.  Yes. At Passages Malibu, it's roughly 30 clients a
23 month. At Passages Ventura, it's between 20 and 30 a month.
24 Q.  Have you noticed any Internet activity from your
25 competitor, Renaissance Malibu?

1  A.  Yes.

2  Q.  What have you noticed?

3  A.  It's been ongoing probably since about 2006.

4  Q.  What do you see happening?

5  A.  They bid on all our names.

6  Q.  And how do you know that?

7  A.  Because when you click on it, it goes to the
8  Renaissance website.  It doesn't come to us.

9         MR. DAVIS:  Objection, vague.

10         THE COURT:  I'll overrule the objection.

11 BY MS. BLOCK: (continuing)

12 Q.  And has Renaissance Malibu, has bidding on your terms,
13 has that impacted your business?

14 A.  Yes.

15 Q.  How has it?

16 A.  I can give you one example.  It was last year.  We had
17 accepted a $15,000 deposit from someone who was coming in,
18 and they wanted to contact us again for some reason, and
19 they clicked on the website Passages Malibu, went to
20 Renaissance, and then David Kaiser got the call and was able
21 to convince them not to go to Passages Malibu but to go to
22 Renaissance.  That was a $78,000 client that we lost due to
23 Malibu -- due to them specifically clicking on the website
24 Passages Malibu, thinking they were coming back to us, and
25 instead they went to Passages -- to Renaissance.

1  testimony, as on page 1 of Exhibit 1, on Google that you
2  have performed in the past?
3  A.   Sometimes it's those, yes.
4  Q.   Now, looking at page 1 of Exhibit 1, can you point out
5  for us anywhere on there where a website you believe is
6  affiliated with a party on the other side of this case from
7  you --
8  A.   Over on the sponsored links, it says "Renaissance
9  Malibu."  That's probably them.
10 Q.   Okay.  Now, just to clarify for this Exhibit 1 -- and I
11 believe that Ms. Smith already testified to this -- can you
12 tell from this exhibit what the search term is that was
13 used?
14 A.   Yes.  "Passages."
15 Q.   And is that one of the terms that you've used also to
16 search on Google?
17 A.   Yes.
18 Q.   Okay.  Now, you said that -- so is it your
19 understanding, then, that when the user typed in "Passages"
20 on this exhibit, a sponsored link was returned that included
21 maliburecovery.com, among others?
22 A.   Yes.
23 Q.   Now, based on the information that is in front of you
24 on Exhibit 1, is there anything here that would tell you
25 what ad word someone associated with maliburecovery.com

1  had ended up at the other treatment center because of the
2  Google search?
3  A.   Yes, specifically.
4  Q.   How many incidents -- how many instances of that
5  occurred?
6  A.   Oh, in the last few years, I would say that the people
7  who have left Renaissance and come to Passages would be a
8  half a dozen over the last probably three years.
9  Q.   And did any of those individuals tell you what they had
10 typed into Google?
11 A.   Not specifically.  They said they were looking for us
12 and got to Renaissance.
13 Q.   So you have no idea how they ended up on your
14 competitors' website?
15 A.   I do have an idea.  The idea is that they typed in
16 "Passages Malibu" and wound up on Renaissance.
17 Q.   But that's speculation, isn't it, sir?
18 A.   No -- well, you're asking me what they specifically
19 typed in.  Of course, I don't know that, but they got there
20 somehow.
21 Q.   Now, sir, I think you submitted a declaration in this
22 case last year, if I'm correct about that.  Do you recall
23 signing that?
24 A.   Yes, I do.
25 Q.   Now, I believe you provided a gross profit margin in

1  there.  Are you an accountant?
2  A.  No, sir, I'm not.
3  Q.  Where did you get the gross profits estimate that you
4  provided in the declaration?
5  A.  I live, eat and breathe what goes on at Passages Malibu
6  day by day.  This is a -- this business is fiercely
7  competitive, and it's always a question of well, are we
8  going to make any money this month or not.  And, you know, I
9  watch those numbers very closely.
10         And that number may be misleading that you have in
11 your declaration because it's based on what would be
12 happening if we had a full house, not if we had 20 people in
13 treatment, because with 20 people, we lose money.  And then
14 if Renaissance takes one of our clients, they're taking
15 $78,550 from us.  It's not profit at that point, but it pays
16 the overhead.
17 Q.  I see.  So the gross profit figure you provided could
18 be misleading?
19 A.  It's out of context.
20 Q.  Do you have a way to provide any better number than
21 that?
22 A.  No.  That's a good number if we have a full house.  But
23 that was a number then, and of course it varies month to
24 month, depending on how much we spend on advertising for
25 that month.  But it's a good number.  When I wrote -- when I

1  gave that declaration, that's a good number.

2  Q.  Based on what point in time?  Your declaration is not

3  specific as to the period of time over which --

4  A.  As of the date when I gave the declaration.

5  Q.  I'm sorry?

6  A.  As of the date when I gave the declaration.

7  Q.  But the number varies from day to day; is that true?

8  A.  Depends on how many people are in treatment.  But that

9  number is based on having a full house.  That number is

10 based on having 40 clients at Passages, and if we have 30

11 clients, that profit number goes down dramatically.

12          MR. DAVIS:  We have nothing further for this

13 witness, Your Honor.

14          THE COURT:  Anything further, Ms. Block?

15          MS. BLOCK:  If I can follow up.

16

17                    REDIRECT EXAMINATION

18 BY MS. BLOCK:

19 Q.  You say if you lose one patient, you can lose $78,550?

20 A.  We do lose that.

21 Q.  Why is that?

22 A.  Because that's our cost.  That's what our tuition is,

23 $78,550 for a month of treatment.

24 Q.  And you said if you have a full house, you have 40

25 people?

1  A.   That's correct.
2  Q.   And how many of those people are coming in from the
3  Internet?
4  A.   Most of them.
5  Q.   And you estimated --
6  A.   Could I elucidate on that a little bit?
7  Q.   Sure.
8  A.   On the television, I publicize my book a lot, and
9  people read the book, and they contact us as a result of
10 that.  And so they know the name.  They usually don't get
11 the contact information from the book, so they'll read the
12 book, and then they'll type in "Passages Malibu" to get to
13 us, having read the book.  But some people just do an
14 Internet search and get to us.
15 Q.   So you can lose $40,000 per patient, you can lose
16 $70,000 per patient, depending on your capacity and what
17 your advertising budget is?
18 A.   Correct.
19 Q.   But you're taking a hit?
20 A.   Absolutely.
21 Q.   How much of a hit are you losing?
22 A.   For one client, $78,550.
23 Q.   And you estimated you're losing at least one to two
24 clients a month?
25 A.   That's correct.

1  Q.   And that's based on you normally have anywhere between
2  30 and 40 patients?
3  A.   That's correct.
4  Q.   And most of them --
5  A.   Closer to 30, but yes, that's correct.
6  Q.   So in your declaration, you stated that you
7  conservatively actively estimated over a year that you have
8  lost $560,000, based on --
9  A.   I was told by Mr. Ganz to be ultraconservative.  It was
10 probably a lot more than that, but that's an easy number to
11 establish, yes.
12 Q.   So you're confident -- excuse me.  You're confident
13 conservatively you've lost about $560,000 a year --
14 A.   At least.
15 Q.   -- in diverted Internet --
16 A.   It's probably closer to $2 million, but that's a
17 minimum number.
18           MS. BLOCK:  Nothing further.  Thank you.
19           THE COURT:  Anything further, Mr. Davis?
20           MR. DAVIS:  Your Honor, just briefly.
21
22                    RECROSS-EXAMINATION
23 BY MR. DAVIS:
24 Q.   You said just a moment ago in your testimony that
25 people get to you in various ways, from the Internet or

Case 2:09-cv-08128-DMG-PLA   Document 69-4   Filed 08/03/10   Page 17 of 18   Page ID #:1508

1  perhaps have read your book.  Do you track how people get to
2  you, how patients get to you?
3  A.    We do.
4  Q.    And do you have any specific tracking of people who
5  found you on the Internet?
6  A.    Say that again, please.
7  Q.    Do you specifically track whether people found you on
8  the Internet?
9  A.    Yes.  When we have an intake call, they have specific
10 questions they ask each caller:  "How did you find us?  Did
11 you see the book on television?  Did you do an Internet
12 search.  If so, what was the term you typed in?"
13        Yeah, we have records of that.  We ask every
14 person that because it's information that's critical.
15 Q.    But none of those records have been submitted to the
16 Court; is that correct?
17 A.    That's correct.
18        MR. DAVIS:  Nothing further, Your Honor.
19        THE COURT:  Thank you, Mr. Prentiss.  You may step
20 down.
21        Anything additional, Ms. Block?
22        MS. BLOCK:  Your Honor, we would like to offer the
23 deposition transcript where Mr. Doroshow's partner accepted
24 service.  I've marked that as Plaintiffs' Exhibit 23, and I
25 gave a copy to counsel.

143

--oOo--

4    I certify, by signing below, that the foregoing is
5    a correct transcript of the record of proceedings in the
6    above-entitled cause.  A transcript without an original
7    signature or conformed signature is not certified.

/s/Bonita J. Shumway                     7/17/10
BONITA J. SHUMWAY, CSR, RMR, CRR         DATE
Official Court Reporter